**In the Matter of the Involuntary Termination of Parental Rights to E.M.I., a Minor Child.**

**Appeal of L.J.I.**

Superior Court of Pennsylvania.

Submitted Sept. 10, 2012.
Filed Dec. 11, 2012.

Robert Varsek, Oil City, for appellant.

Joseph E.B. McDaniel, Fairmont City, for E.M.I., appellee.

John P. Troese, Clarion, for D.J.C., participating party.

BEFORE: GANTMAN, J., WECHT, J., and FITZGERALD, J.*

OPINION BY GANTMAN, J.:

Appellant, L.J.I. ("Mother"), appeals from the order entered in the Clarion County Court of Common Pleas, which denied her petition for involuntary termination of the parental rights of D.J.C. ("Father") to E.M.I. ("Child"). Mother asks us to determine if the court erred when it denied Mother's termination petition because she failed to demonstrate a "contemplated adoption" of Child. We hold the court properly denied the petition, where Mother offered insufficient evidence that the proposed adoption of Child by Mother's domestic partner, S.S., would serve Child's best interests. Accordingly, we affirm.

The relevant facts and procedural history of this case are as follows. Father and Mother are the natural parents of Child, who was born in 2008. Mother and Father dated less than a year, were not married, and ended their relationship sometime during the pregnancy. Father is 22 years old, lives at his mother's home in Butler County, and is currently employed. Moth-

---

* Former Justice specially assigned to the Superior Court.

er is a full time university student and about the same age as Father. When Child was born, Mother resided in her father's home in Karns City, but she moved in August 2009, after her parents divorced and her mother remarried. Mother currently lives with Child in Clarion, Clarion County, near Mother's university, in the home of Child's maternal grandmother and maternal step-grandfather, about an hour's drive from Father.

During the first few months of Child's life, Father saw Child weekly at maternal grandfather's home in Karns City. The visits gradually became less frequent as the year progressed, with Father's appearances dwindling to monthly visits of an hour or two. When Mother moved with Child to Clarion in August 2009, Father's relationship with Child diminished even more significantly. Mother and Father communicated primarily through text messages to set up informal visits when Mother and Child stayed at maternal grandfather's home in Karns City. Father saw Child on rare occasions, but generally the visits just fell through.

Father has not paid child support, and his employment history is sporadic. He gave Child gifts at Christmas, but the parties dispute who actually paid for the gifts. There is almost no dispute, however, that Father has had limited contact with Child since August 2009. Father has seen Child in person only "a handful of times" since the move and has had no telephone contact or written correspondence to Child. At Father's latest in-person visit, Child did not recognize him.

Mother began a relationship with S.S. in 2009. They parted for two or three months around December 2010, subse-

quently reconciled, and have been in a continuous relationship since then. Mother attributed their split to maturity issues but insists it was temporary and any problems have been resolved.

Mother and S.S. now live together in maternal grandmother's and maternal step-grandfather's home. S.S.'s move-in was gradual. S.S. began staying at the home some nights, then more often, and eventually moved most of her belongings into the home. Five persons total live in the household—maternal grandmother, maternal step-grandfather, Mother, Child, and S.S. It is not clear who financially supports Child. Mother has worked at summer jobs and saved money, while S.S.'s plans are to enlist in the military. According to the record, there has been no discussion on who intends to pay for adoption proceedings.

Child is four years old and well-adjusted by all accounts, enrolled in school, and involved in various activities. S.S. contributes to the care of Child by performing duties such as bathing, dressing, and feeding. S.S. also picks Child up from school when either Mother or maternal grandmother is unavailable. According to Mother, Child and S.S. have a close relationship, tell each other "I love you," and generally express mutual affection. Most portions of the record describe S.S.'s relationship with Child as "friend-like"; other portions suggest S.S. acts as a secondary parent.

In December 2011, Mother and S.S. traveled to New York, where they married in a civil ceremony.[1] Mother and S.S. wed for several stated reasons, not only to express their love and commitment to each other but also to formalize their relationship before S.S. left for military training.[2]

1. New York legalized same-sex marriage in July 2011. *See* N.Y. Domestic Relations Law § 10–a.

2. As of April 2012, S.S. had enlisted with the U.S. Army and was scheduled to leave for boot camp sometime during summer 2012.

Mother claims Child knows Mother and S.S. are "married."

On December 2, 2011, Mother filed a petition for involuntary termination of Father's parental rights. In the petition, Mother stated Father had no relationship with Child. Additionally, Mother averred S.S. planned to adopt Child. The court held two hearings on Mother's petition in February and March 2012, respectively. Mother, Father, maternal grandmother, maternal grandfather, and paternal grandmother testified. There was extensive evidence from Mother and her parents about Father's lack of contact with Child and his excuses for failing to maintain a relationship. In response, Father stated Mother excluded him from Child by placing obstacles to his visitations. Father claimed he made best efforts to see Child but could not break through Mother's various time constraints and other barriers.

Evidence of S.S.'s intent to adopt Child was very limited and dealt primarily with Mother's and Child's relationship with S.S. Although present during Mother's case, S.S. did not testify. Other than Mother's averment in the termination petition regarding S.S.'s intent to adopt Child, S.S. offered no direct evidence about her goal to adopt Child or how that was likely to occur.

After the hearings concluded, the court issued a written decision on April 20, 2012, denying Mother's termination petition. The court first found Father had no meaningful relationship with Child, and Father's inaction demonstrated a settled purpose to relinquish his parental rights to Child. The court also stated Child was well cared-for in her current living situation. Considering Father's significant absence from Child's life, the court concluded termination of Father's parental rights would not negatively affect Child's general welfare.

The court next examined whether, given the evidence presented, the proposed adoption of Child was likely to occur. The court acknowledged the relationship of S.S. with Mother and Child but found Mother had failed to demonstrate the strength of S.S.'s potential adoption of Child. Given that the adoption of Child was a necessary prerequisite to the success of Mother's termination petition, the court denied the petition. Mother timely filed a notice of appeal on May 17, 2012. The court ordered a concise statement of errors complained on appeal pursuant to Pa.R.A.P.1925. Mother timely complied.

Mother now raises three issues for our review:

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING [MOTHER'S] PETITION FOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS OF THE BIOLOGICAL FATHER AFTER DETERMINING THAT TERMINATION OF FATHER'S RIGHTS WILL NOT NEGATIVELY AFFECT THE GENERAL WELFARE AND NEEDS OF THE SUBJECT MINOR CHILD?

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED AN ERROR OF LAW BY DETERMINING THAT THE ANTICIPATED ADOPTION OF [CHILD] BY [S.S.] IS NOT LEGALLY PERMISSIBLE UNDER PENNSYLVANIA'S ADOPTION ACT?

WHETHER THE TRIAL COURT'S DETERMINATION, THAT [MOTHER] FAILED TO SUSTAIN HER BURDEN TO PROVE "GOOD CAUSE" UNDER SECTION 2901 OF THE ADOPTION ACT TO PROCEED WITH THE ANTICIPATED ADOPTION OF [CHILD] BY [S.S.], WAS CONTRARY TO AND UNSUPPORTED BY THE EVIDENCE OF REC-

ORD AND CONTRARY TO CONTROLLING PRECEDENT AND LAW?

(Appellant's Brief at 4).

Mother first argues that she proved Father failed to fulfill his parental duties for the statutory time and termination of his parental rights would not adversely affect Child's general welfare. As a result, Mother claims it was illogical and inconsistent for the court to deny Mother's petition for involuntary termination of Father's parental rights. Mother argues the court's decision, by its own terms, runs contrary to Child's best interest because the net effect of the ruling was to retain a delinquent parent's rights to a child whom that parent has abandoned. Mother asserts termination of Father's parental rights would really best serve Child's best interests. Mother concludes the court's contrary decision was an abuse of discretion.

Mother's second and third issues deal with the "anticipated adoption" element of these proceedings. Mother begins with the proposition that same-sex couples can jointly adopt a child who has no legal parents. Mother further reasons that anyone may adopt in Pennsylvania including, for example, a grandfather or a same-sex partner. Mother complains the court denied her prayer for termination of Father's parental rights, so that S.S. could adopt Child, without fully considering all of the factors incident to Child's best interests. Mother contends the court's ruling suggests that in non-traditional or second parent/non-spouse settings, the parties must effectively engage simultaneously in termination and adoption hearings. Mother maintains the termination proceedings should precede the filing of a petition to adopt, and the court misinterpreted the procedural interplay of these hearings by assessing S.S.'s "proposed adoption" of Child before terminating Father's parental rights. Mother claims the record is replete with ample evidence to support S.S.'s proposed adoption of Child. According to Mother, the trial court's decision basically denied Child the invaluable benefits and bonds of a *"de facto"* parent who is ready, willing, and able to assume the legal status of parent and fill the void created by a neglectful, absentee biological Father. (Mother's Brief at 21). Essentially, Mother concludes the court's judgment on the "anticipated adoption" of Child by S.S. was premature and based on an incomplete factual record.

At the hearing, Child's Guardian *ad litem* ("GAL") told the court in few words that he was not taking a strong stance for either of the parties and was leaving it to the court to decide if Mother had met her burden to terminate Father's parental rights. (*See* N.T. Hearing, 3/9/12, at 108–109.) Nevertheless, GAL has filed a brief on appeal and argues the court examined only Mother's petition for involuntary termination of Father's parental rights and Mother's averment that S.S. intended to adopt Child. By allowing Mother to proceed with her termination petition without requiring S.S. to file a report of intent to adopt, GAL claims the court treated S.S. as an unrelated adult and examined Mother's petition on an incomplete record. GAL asserts the court should have conducted a more thorough hearing on S.S.'s proposed adoption of Child and Child's best interests. GAL also complains the court improperly relied on certain irrelevant social and financial factors in denying Mother's termination petition, despite the evidence that Child was well cared-for and adjusted, and her needs were being met. According to GAL, the court should not have considered whether Mother and S.S. constituted an independent, defined family unit or who actually provided financial support for Child. GAL further takes issue with the court's consideration of Mother's

and S.S.'s youth and the court's failure to weigh the possibility of Child's adoption in another jurisdiction. GAL concludes we should remand for further proceedings.

Father disagrees with the positions of both Mother and GAL in several respects. First, Father notes Mother and GAL essentially contest the court's discretionary ruling, which is supported by competent evidence of record. Father reiterates that Mother had the burden to make her termination case before the court, by clear and convincing evidence. The testimony, however, was unclear that S.S. was an authentic parent figure in Child's life. So, the court necessarily examined the "family" circumstances to determine whether S.S. had a unique and substantial role in Child's life separate from the other general household members. In short, Father insists the court looked for in S.S. what the law and society expects from a parental figure. Father submits Mother failed to establish that she and S.S. had similar, sound life goals or plans, which were, by and large, still undecided. Absent a clearly established family unit or confirmed life plans, and in light of their age and the brevity of their relationship, the court believed Mother did not present enough to prove the "planned adoption" element necessary to terminate Father's parental rights. Father concludes the court made a thoughtful and reasoned decision, supported by competent evidence, and this Court should affirm. For the following reasons, we agree.

■ The well-settled principles of appellate review in this context are:

When reviewing a decree entered by the Orphans' [c]ourt, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' [c]ourt sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

*In re A.J.B.,* 797 A.2d 264, 266 (Pa.Super.2002). In other words,

In cases involving termination of parental rights, our scope of review is broad. All of the evidence, as well as the trial court's factual and legal determinations, are to be considered. However, our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child. We have always been deferential to the trial court as the fact finder, as the determiner of the credibility of witnesses, and as the sole and final arbiter of all conflicts in the evidence.

*In re S.D.T., Jr.,* 934 A.2d 703, 705–06 (Pa.Super.2007), *appeal denied,* 597 Pa. 68, 950 A.2d 270 (2008) (citations omitted). The burden of proof in a termination case is on the petitioning party, who must establish valid grounds for termination by clear and convincing evidence. *In re J.L.C.,* 837 A.2d 1247, 1251 (Pa.Super.2003).

■ Part III of the Domestic Relations Code is known and referred to in whole as the Adoption Act. *See* 23 Pa. C.S.A. § 2101. The Adoption Act consists of five chapters and numerous respective subchapters; those provisions most relevant to this case appear in Chapter 25 (governing proceedings prior to petition to adopt including termination of parental rights); and to a lesser extent, Chapter 27 (governing the petition for adoption) and Chapter 29 (governing decrees and records). *See* 23 Pa.C.S.A. §§ 2501–2903. Adoption in Pennsylvania is purely a statutory right. *In re Adoption of R.B.F.,* 569 Pa. 269, 276, 803 A.2d 1195, 1199 (2002). Strict compliance with the Adoption Act is

a prerequisite to the court's jurisdiction to hear a petition to terminate parental rights in connection with a proposed adoption. *In re Adoption of J.F.D.*, 782 A.2d 564, 565 (Pa.Super.2001) (citing *In re Adoption of W.C.K.*, 748 A.2d 223, 226 (Pa.Super.2000), *appeal denied*, 567 Pa. 745, 788 A.2d 378 (2000)).

■ Section 2512 governs who may bring a petition to terminate parental rights, and what the petition must contain, as follows:

### § 2512. Petition for involuntary termination

(a) **Who may file.**—A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:

(1) Either parent when termination is sought with respect to the other parent.

(2) An agency.

(3) The individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt).

(4) An attorney representing a child or a guardian ad litem representing a child who has been adjudicated dependent under 42 Pa.C.S. § 6341(c) (relating to adjudication).

(b) **Contents.**—The petition shall set forth specifically those grounds and facts alleged as the basis for terminating parental rights. The petition filed under this section shall also contain an averment that the petitioner will assume custody of the child until such time as the child is adopted. If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.

\* \* \*

23 Pa.C.S.A. § 2512. If the petitioner is not an agency, then the petition must include "an averment that an adoption is presently contemplated or that a person with a present intention to adopt exists." *In re Adoption of J.F.D., supra* at 567.

■ A petition to terminate a natural parent's parental rights, filed by one natural parent against the other under Section 2512(a)(1), is cognizable only if an adoption of the child is foreseeable. 23 Pa.C.S.A. § 2512(b); *In re Adoption of L.J.B.*, 610 Pa. 213, 228, 18 A.3d 1098, 1107 (2011). *See also In re B.E.*, 474 Pa. 139, 142, 377 A.2d 153, 154 (1977) (stating petition filed by one biological parent for involuntary termination of other biological parent's parental rights can survive only "in connection with a plan for adoption"; affirming denial of biological mother's petition for involuntary termination of biological father's parental rights, even upon proof of natural father's abandonment of child, absent mother's plan to have child adopted by step-parent or any other person). Even when a Section 2512(a)(1) petition might satisfy the statutory requirements for termination, a court still cannot grant the petition without a corresponding plan for an anticipated adoption of the child. *In re Adoption of L.J.B., supra* at 228, 18 A.3d at 1107. *See In re Adoption of J.F.*, 392 Pa.Super. 39, 572 A.2d 223, 225 (1990) (construing language in subsection (b), albeit under a prior version, to mean that biological parent may not petition to terminate other biological parent's parental rights unless adoption is planned). A "contemplated adoption" is required in this context because Section 2512(a)(1) was not designed as a punitive measure to penalize an ineffective or negligent parent. *In re B.E., supra* at 145, 377 A.2d at 156.

[E]xamination of the Adoption Act in its entirety reveals a singular concern with adoption proceedings. Provisions for involuntary termination of parental rights are contained, along with provisions for the voluntary relinquishment of parental

rights and duties, within article III of the Act, entitled "Proceedings Prior to Petition to Adopt." Consistent with this heading, the purpose of voluntary relinquishment and involuntary termination of parental rights is evidenced by section [2521], which provides that the effect of either decree shall be to "extinguish the power or the right of [the] parent to object to or receive notice of adoption proceedings." We think it clear that the Legislature intended the petition for involuntary termination of parental rights to be available solely as an aid to adoption.

*Id.* at 144–45, 377 A.2d at 155.[3] The attendant plan for adoption serves the primary goal of the Adoption Act by placing the child in a "new parent-child relationship" with the adoptive parent(s). *In re Adoption of L.J.B., supra* at 230, 18 A.3d at 1108.

■■■ The Adoption Act also provides that any individual may become an adopting parent. 23 Pa.C.S.A. § 2312. The "any individual" includes same-sex couples, who may adopt in Pennsylvania, provided they comply with the statutory requirements of the Adoption Act. *In re Adoption of R.B.F.* at 280, 803 A.2d at 1202.

■■■ Pennsylvania, however, does not yet recognize marriages between same-sex couples. *See* 23 Pa.C.S.A. § 1704 (defining marriage as between one man and one woman and stating marriages between persons of same sex, even when entered into validly in another jurisdiction "shall be void in this Commonwealth").

Thus, same-sex couples are not considered legal "spouses" under Pennsylvania law and cannot adopt as a "spouse" or "stepparent" under Section 2903 (spousal exception provision available only in private family adoptions, upon marriage or remarriage of biological father or mother, where natural parent consents to adoption of child by natural parent's new spouse while natural parent retains parental rights to child). *In re Adoption of R.B.F., supra* at 277, 803 A.2d at 1199–1200. Consequently, a proposed adoption by same sex couples is treated as a "non-spouse" adoption under the Adoption Act. *Id.*

As a general rule, the biological parent who files a petition to terminate the parental rights of the other biological parent, with the intent to retain custody or physical care of the child, does not have to file an accompanying report of intention to adopt. *See* 23 Pa.C.S.A. § 2531(c) (stating: "No report shall be required when the child is the child, grandchild, stepchild, brother or sister of the whole or half blood, or niece or nephew by blood, marriage or adoption of the person receiving or retaining custody or physical care"). If the biological parent's termination petition serves as a pathway for the adoption of the child by a person who is not exempt under Section 2531(c), the case law seems to suggest the biological parent's termination petition should be accompanied by the non-exempt person's intention to adopt.[4] *See In re Adoption of L.J.B., supra* at 228, 18 A.3d at 1107.

**3.** *See also* 23 Pa.C.S.A. § 2714 (relating to when consent of parent is not required for adoption, stating: "Consent of a parent to adoption shall not be required if a decree of termination with regard to such parent has been entered. When parental rights have not previously been terminated, the court may find that consent of a parent of the adoptee is not required if, after notice and hearing as prescribed in section 2513 (relating to hearing), the court finds that grounds exist for involuntary termination under section 2511 (relating to grounds for involuntary termination)").

**4.** The case law, however, is unclear on how detailed the averment of intention to adopt must be or whether the other person's intention to adopt must be formally filed and attached to the termination petition.

■ Assuming the termination pleading meets threshold requirements, the court proceeds with the two-part test for termination of parental rights under Section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. The initial focus is on the conduct of the parent whose rights are at issue. *In re C.L.G.*, 956 A.2d 999, 1004 (Pa.Super.2008) *(en banc)*. A party seeking termination under Section 2511(a)(1) must demonstrate the other parent has either: (1) shown a settled purpose to relinquish his parental claim to the child; or (2) failed to perform parental duties for at least six months prior to the termination petition. *In re I.J.*, 972 A.2d 5, 10 (Pa.Super.2009). The second prong of the test centers on the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super.2010). "A proper Section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re T.D.*, 949 A.2d 910, 920 (Pa.Super.2008), *appeal denied*, 601 Pa. 684, 970 A.2d 1148 (2009). The court should examine intangibles such as "love, comfort, security, and stability" when determining the needs and welfare of the child. *Id.*

■ Current case law indicates that while an averment of a contemplated adoption might be sufficient to obtain a hearing on the termination petition, at the termination hearing the petitioning parent must demonstrate the planned adoption is also in the child's best interests, before the court will terminate the parental rights of the responding parent. *See In re Adoption of L.J.B.*, *supra* at 232, 18 A.3d at 1110–11 (implying no gain to child or society is achieved by terminating one parent's rights to permit adoption by another who is unwilling or unqualified to adopt). Thus, as part of its Section 2511(b) analysis of the needs and welfare of the child in this context, the court must address and evaluate the "proposed adoption" that was averred in the termination petition. *See generally id.*

■ In the present case, Mother filed a petition to terminate Father's parental rights to Child, alleging the grounds and facts which form the basis for terminating Father's parental rights, S.S. would like to adopt Child, and Mother agrees to assume and continue to assume custody of Child until such time as Child is adopted. *See* 23 Pa.C.S.A. § 2512(a)(1), (b). Therefore, Mother's petition fulfilled the minimal requirements to invoke the court's jurisdiction over the petition. *See In re Adoption of J.F.D.*, *supra* at 565–66 (observing Adoption Act requires certain enumerated averments in petition for terminating parental rights as prerequisite to court's jurisdiction to hear petition).

■ On appeal, the parties essentially disagree on whether Mother's evidence of the "contemplated adoption" of Child by S.S. was sufficient to terminate Father's parental rights. Mother's contention, that termination of Father's parental rights should have been automatic because she met the ordinary requirements of Section 2511(a), does not account for the court's duty to consider the separate aspect of the necessary "contemplated adoption" as part of the court's Section 2511(b) analysis of Child's best interests. In the particular paradigm of this case, the court could grant Mother's termination petition only upon a satisfactory showing that an adoption of Child was likely to occur. *See* 23 Pa.C.S.A. § 2512(b); *In re B.E.*, *supra* at 142, 377 A.2d at 154 (stating for one biological parent to succeed in terminating parental rights of other biological parent under Adoption Act, parent seeking termination must show new parent-child relationship is foreseen; termination of parental rights in this context is available solely as aid to planned adoption). Per the Adoption Act, Mother had to prove anoth-

er person exists with the present intent to adopt Child. *See In re Adoption of L.J.B., supra* at 228–30, 18 A.3d at 1107–08. Thus, in conjunction with the statutory requirements of Section 2511(a), Mother had to prove the "anticipated adoption" element as part of Section 2511(b), before the court could terminate Father's parental rights to Child.

▉▉▉▉▉▉ Assuming Mother proved Father had failed to fulfill his parental duties and termination of his parental rights would not harm Child's general welfare under Section 2511(a), Mother's position neglects to account for the additional component of the "planned adoption" in deciding Child's best interests. Instead, Mother simply takes the punitive view of termination proceedings that our Supreme Court expressly rejected in this context and asks us to ignore the well-established requirement that involuntary termination (when brought by one parent against another) is cognizable only if there is an "anticipated adoption." *See id.* at 230, 18 A.3d at 1108 (stating termination proceedings do not exist to punish ineffective parent but to foster new parent-child relationship through corresponding adoption). We decline Mother's invitation in this regard. Without sufficient proof of the "anticipated adoption" component, Mother could not succeed in terminating Father's parental rights to Child. In fact, the success of Mother's petition to terminate Father's parental rights turned on her ability to convince the court that S.S. planned to adopt Child and that the adoption was likely to happen. *See id.*

In its analysis of the case, the Orphans' court (1) was "convinced that over a period of more than six months, [Father] has shown a settled purpose of relinquishing parental claims to [Child] and has refused or failed to perform his parental duties"; (2) found "there were no barriers or obstacles preventing [Father] from having con-

tacts with [Child] that could not have been overcome with 'reasonable firmness' "; and (3) found there was "no parent-child relationship ... formed between [Father] and [Child]" and "it cannot be said that termination of his rights will negatively affect the general welfare or needs of [Child]." (*See* Orphans' Court Opinion, filed April 18, 2012, at 8, 11–12.)

Assessing the "proposed adoption" of Child by S.S., the court borrowed from the "cause shown" standard of Section 2901 of the Adoption Act, which gave the court a foundation for deciding whether the proposed adoption of Child by S.S. would place Child in a new parent-child relationship with S.S., foster the creation of a family unit for Child, and further the best interests of Child. *See Adoption of L.J.B., supra* at 230, 18 A.3d at 1108 (stating involuntary termination is not permitted where no adoption or "new parent-child relationship" is contemplated because sole purpose of termination is to further adoption and establish new family unit). Contrary to Mother's contentions, the court did not force Mother to engage simultaneously in termination and adoption hearings. The purpose of the court's "cause shown" approach was consistent with legal precedent that requires the court to analyze the integrity of the "proposed adoption" of Child by S.S. and whether it was likely to happen. *See In re T.R.,* 502 Pa. 165, 169 n. 10, 465 A.2d 642, 644 n. 10 (1983) (insisting court should actually consider adoptive parent's intent to adopt and not merely accept adoption averment on its face). The court's concern with the "proposed adoption" by S.S. centered on its findings that: (1) a parent-child relationship did not exist between S.S. and Child; (2) an adoption by S.S. would not foster the creation of a new family unit for Child; and (3) the adoption as proposed would not serve the best interests of Child. (*See* Orphans' Court Opinion at 15–16)

(discussing adoption petition and circumstances surrounding adoption that fail to support favorable finding of child's best interests).

Regarding the lack of a parent-child relationship between S.S. and Child, the court initially acknowledged evidence that S.S. looked after Child and cared for Child. Nevertheless, the court was unconvinced that a genuine parent-child relationship existed between S.S. and Child, where several other members of the household assumed the primary parental responsibilities for Child. Those persons included Mother, maternal grandmother, and step-grandfather. The presence of those additional persons in the home and their significant roles as Child's caregivers and financial supporters, led the court to conclude S.S. did not play a defined parental role in Child's life.

As well, the court was unable to discern the true nature of the personal relationship between S.S. and Child. Some testimony described the two as a classic parent-child pairing, while other aspects of the record made the relationship appear more like friends. S.S. did not choose to testify, so the court had no first-hand account of her relationship with Child.

The court further observed Mother, S.S., and Child still lived in the home of maternal grandmother and step-grandfather, without ever having lived on their own as a defined family unit. Moreover, the relationship history of Mother and S.S. was relatively short (approximately three years, with a brief split in December 2010). Nothing in the record showed Mother and S.S. were able to financially support themselves. S.S. was reportedly unemployed, and Mother offered only minimal testimony about her earnings from a summer job. S.S. did not testify to give the court any specific evidence about her intentions to support Child. Likewise, no evidence of

record suggested that S.S. had ever financially contributed to Child's support.

Additionally, the court saw a real potential for instability for Child in light of S.S.'s plan to join the military and be separated from Mother and Child for an extended time. (*See* Orphans' Court Opinion at 16.) In the court's view, the adoption would not provide a steady situation for Child at this time, where S.S. had not been a part of Child's life for most of her first two years and would be gone for additional time while S.S. was in the military. The court also saw how that separation could easily strain Mother's and S.S.'s fledgling relationship.

In a later opinion, the court reiterated that Mother had a full opportunity at the termination hearing to show cause why S.S. should be able to adopt Child. Without hearing directly from S.S., the court had "no evidence of her opinion on the stability of the relationship with [M]other. Without [S.S.'s] testimony, it was difficult to determine definitively that [S.S.] viewed herself as a parental figure to [Child] and has the requisite intent to adopt her. Particularly, the fact that [S.S.] would soon be moving away on military duty for an extended period caused this court to question how she could realistically maintain a parental role and whether she, [Mother] and [Child] would be living together." (*See* Orphans' Court Opinion, dated June 15, 2012, at 2.)

The decision not to have S.S. testify about her adoption intentions obviously played a significant role in the court's judgment to reject the alleged "proposed adoption." Mother essentially asked the court to determine the viability of a "proposed adoption" without even offering the testimony of the one person most critical to the adoption plan. The absence of S.S.'s testimony limited the court's ability to evaluate her relationship with Child or the genuineness of S.S.'s intention to adopt

Child. The court properly refused to guess S.S.'s intentions or accept evidence of her intentions second-hand or speculate regarding the "proposed adoption" of Child by S.S. Given that uncertainty, the court could not find the "proposed adoption" was truly in Child's best interests. Therefore, without a "contemplated adoption" of Child, the court declined to terminate Father's parental rights and denied Mother's petition.

Under these specific facts and circumstances, the court's decision was not an abuse of discretion. As the petitioner, it was incumbent upon Mother to present adequate evidence in support of the petition. Mother must now bear the responsibility for any complaint that the court issued a decision on an incomplete record, as it was her burden to offer unequivocal factual support for S.S.'s potential adoption of Child. Although the hearings contained ample testimony on Father's parenting deficiencies, there was a noticeable absence of solid facts about the "contemplated adoption" element required under the Adoption Act and how the "proposed adoption" would foster a new family unit in Child's best interests.[5] Quite simply,

Mother did not carry her evidentiary burden. Contrary to the contention of Child's GAL, the court had no duty to require S.S. to file an intention to adopt or otherwise expand the record. Ultimately, the court correctly centered its analysis on the primary goals of the Adoption Act—the best interests of Child and the creation of a new family unit through an adoption. On this record, we cannot fault the court's decision to deny Mother's petition to terminate Father's parental rights to Child.

■ Based upon the foregoing, we hold the court did not abuse its discretion when it denied Mother's petition to terminate Father's parental rights to Child at this time, where Mother offered insufficient evidence that the "proposed adoption" of Child by S.S. would serve Child's best interests. Accordingly, we affirm the court's order denying Mother's petition to terminate Father's parental rights, albeit on alternative reasoning.[6]

Order affirmed.

---

**5.** Mother's reliance on *In re Adoption of J.M.,* 991 A.2d 321 (Pa.Super.2010) to support her contention that the court improperly conducted the cause shown analysis is inapposite. The *J.M.* Court remanded for additional hearings because the trial court had not considered whether the mother could show good cause under Section 2901. In contrast, here the court conducted a detailed cause shown discussion and properly focused on the underlying purpose of the Adoption Act and the best interests of Child. The court examined the facts as presented in their totality before reaching its conclusion. For these reasons, the superficial similarities between Mothers' petition and the one in *J.M.* are ultimately distinguishable. *J.M.* is additionally inapposite because the proposed adoptive parent—in that case, the child's grandfather—appeared and testified at the termination hearings. *Id.* at 325. The grandfather spoke about the time he spent with child, caregiving duties he per-

formed, and financial support he had provided in the past and intended to provide in the future. *Id.* The grandfather also stated he firmly believed the child needed a father figure and intended to fill that role through an adoption. *Id.* There was no testimony of a similar nature from S.S. in this case.

**6.** Importantly, we can affirm the Orphans' court order on any valid basis, as long as the court came to the correct result, which in this case was to deny Mother's termination petition. *See Wilson v. Transport Ins. Co.,* 889 A.2d 563, 577 n. 4 (Pa.Super.2005) (citing *Boyer v. Walker,* 714 A.2d 458 (Pa.Super.1998) (stating appellate court may affirm order of trial court on any basis if decision is correct); *Alco Parking Corp. v. Public Parking Authority of Pittsburgh,* 706 A.2d 343 (Pa.Super.1998), *appeal denied,* 555 Pa. 725, 725 A.2d 178 (1998) (stating where trial court has

reached correct result, its order will be sus-tained if it can be sustained for any reason)).