J-A22015-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: B.C.D., A MINOR CHILD | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.A.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 458 WDA 2022 |

Appeal from the Decree Entered March 31, 2022
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s):  336 OC 2021

| | | |
|---|---|---|
| IN RE: B.C.D., A MINOR CHILD | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.A.D.,  FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 459 WDA 2022 |

Appeal from the Decree Entered March 31, 2022
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s):  337 OC 2021

BEFORE:   OLSON, J., DUBOW, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:                **FILED:  September 8, 2022**

In this consolidated appeal,[1] Appellant, M.A.D., ("Father") appeals from

the March 31, 2022 decrees terminating his parental rights to his dependent

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] In a May 31, 2022 *per curiam* order, this Court consolidated the two appeals *sua sponte*.

children, B.C.D., a male child born in June 2018, ("Son") and B.C.D., a female child born in March 2016, ("Daughter") (collectively, "the children"), pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.  We vacate the termination decrees and remand this case in accordance with this memorandum.

The record demonstrates that on October 27, 2021, the children's biological mother, A.M.D., ("Mother") filed a petition for involuntary termination of Father's parental rights as to Son at orphans' court docket number 336 OC 2021.  That same day, Mother filed a petition for involuntary termination of Father's parental rights as to Daughter at orphans' court docket number 337 OC 2021.[2]  **See** Petition for Termination of Parental Rights to Son, 10/27/21; **see also** Petition for Termination of Parental Rights to Daughter, 10/27/21.   Mother's fiancé, T.D.F., ("Fiancé") joined both petitions for involuntary terminate of Father's parental rights.[3]  On October 27, 2021, Mother and Fiancé also filed a report of Fiancé's intent to adopt the children, upon termination of Father's parental rights.  **See** Report of Intention to Adopt Son, 10/27/21; **see also** Report of Intention to Adopt Daughter, 10/27/21.

---

[2] In both petitions for involuntary termination of Father's parental rights, Mother asserted that Father's parental rights should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2), and § 2511(b).

[3] Fiancé joined both petitions as a party-petitioner seeking the involuntary termination of Father's parental rights to the children.

On November 1, 2021, the trial court appointed Gina Bianco, Esquire ("Attorney Bianco") to represent the legal and best interests of the children. Trial Court Order, 11/1/21. That same day, the trial court also appointed Danielle N. Melillo, Esquire to represent Father, who was incarcerated at a state correctional institution. *Id.* A termination hearing was held on March 22, 2022, at which Mother's and Fiancé's counsel, counsel for the children, and Father's counsel, as well as Mother, Father, and Fiancé, participated.[4]

After concluding the termination hearing, the trial court made the following findings of fact:

> [Daughter] was born [in] March [] 2016. From March 2016[,] to October 2016, [Father] drove [a] truck [as part of his employment] and was gone [from the home] for weeks at a time. After October [2016,] he was home for a day or two, but when he was home[,] he was always at the bar or [using] drugs. Mother was the sole caregiver of [Daughter].
>
> Father went to an inpatient drug and alcohol [rehabilitation facility] for about a month in March or April 2018. When he got out, he [admitted to Mother] that he had been using [methamphetamine], cocaine, pills, and anything else he could get his hands on.
>
> He also went to a mental health facility [for treatment[5]] and admitted his drug abuse to [Mother]. After [being released from

_____

[4] Father participated in the termination hearing *via* video conference due to his incarceration status. N.T., 3/22/22, at 2.

[5] The trial court found that Father "went to a mental health facility on a 302 placement" which is an involuntary emergency examination and treatment commitment pursuant to 50 P.S. § 7302 of the Mental Health Procedures Act. *See* Trial Court Opinion, 3/31/22, at 3; *see also* 50 P.S. § 7302. The record reflects, however, that Father voluntarily committed himself to the mental

rehabilitation], the relationship between [Mother] and [Father] was very rocky. [Father] met another woman at [the rehabilitation facility] and [posted] pictures of her as his girlfriend [on social media]. He never returned to live with [Mother]. He left [Mother] alone to care for [Daughter].

[Son] was born [in] June [] 2018. Father was not present when he was born. He [allowed Mother] to care for his son.

Mother filed a complaint in divorce[] and for custody with [the trial] court on August 22, 2018. [Mother and Father] agreed to a consent order for custody on October 3, 2018. They agreed [Mother] would have sole physical custody of [Son] and primary physical custody of [Daughter] and [Father] would have periods of supervised custody with [Daughter]. There is no provision in the [consent] order for [Father] to have physical custody of [Son] because [Father] did not claim [Son] was his child and he did not want custody.

The [trial] court issued a divorce decree on December 12, 2018.

Father had minimal contact with [Daughter] until he started attending supervised visits at [an outpatient psychiatric clinic] in October 2018. [The outpatient psychiatric clinic] reported to the [trial] court that [Father] attended two [one-]hour supervised visits [with Daughter] in October 2018, three [two-]hour visits in November [2018], one [two-]hour visit in December [2018], and one [two-]hour visit on January 7, 2019. The visits went well. Father did not attend any other visits in January [2019,] because he was incarcerated on a probation violation. Mother took both children to each of the supervised visits, but [Father] never asked to see [Son].

Father was incarcerated in the Clarion County Jail in January 2019[,] because during a probation check, the [probation] officer

_____

health facility for treatment pursuant to 50 P.S. § 7201 of the Mental Health Procedures Act. **See** N.T., 3/22/22, at 13 (stating, "I [(Mother)] filled out the paperwork for him to be 302'd but he ended up going willingly so that he could keep his handgun permit"); **see also** 50 P.S. § 7201 (stating, "[a]ny person 14 years of age or over who believes that he[, or she,] is in need of treatment and substantially understands the nature of voluntary treatment may submit himself[, or herself,] to examination and treatment under this act, provided that the decision to do so is made voluntarily").

found [Father] possessed [methamphetamine]. As a result of the incarceration, [the trial] court issued an order on February 4, 2019[,] rescinding [Father's] custody rights to [Daughter] and canceling the supervised visits at [the outpatient psychiatric clinic].

Father filed handwritten petitions [with the trial court] from [] jail[,] asking for contact with the children. The [trial] court [entered] an order on December 11, 2019[,] directing the parties to participate in [a parenting] program at the jail. Father completed some, but not all[,] of the modules of the program. Mother did not take the children to the jail for visits because she thought it was not a good place for young children.

When [Father] got out of the county jail, he relapsed. While under the influence of drugs [or] alcohol, [Father] drove a vehicle and struck and killed a man as [the man] was standing in his yard. Father was convicted of vehicular homicide while [driving under the influence]. On February 14, 2020, [the trial] court sentenced [Father] to a minimum sentence in state prison of seven and one[-]half years[' incarceration].

Mother filed a petition for modification of [the] prior custody agreement. Upon the agreement of the parties, the [trial] court issued an order on February 25, 2020[,] awarding sole legal custody and primary physical custody of both children to [Mother]. In paragraph 3 [of said order], the [trial] court stated, ["]visitation or contact between Father and the minor children shall be at the discretion of Mother only."

Father [] made multiple attempts to communicate with the children by sending letters to [Mother], addressed to two different post office boxes. Most of his letters [were] returned as undeliverable. There has been confusion about which [post office] box [address Father] was to use. Exhibit 16 is the order of court [entered] April 15, 2021[, at the conclusion of] a pre-trial conference on [Father's] petition for modification of custody. The [trial] court stated in paragraph 1 [of said order] that due to [Father's] incarceration in state prison "in-person visitation with the two minor children is not feasible or appropriate at this point in time."

The order was a final order[,] and no trial was scheduled.

Father wrote to [Mother] on April 18, 2021[,] asking her to [] visit him in prison and to communicate with him in writing. [Father's

letter] is in the nature of a love letter. [In the letter, Father] stated he was not going to ask to see the children. Father said he expects to be released from prison on May [6], 2027. He admitted he was "so mentally gone from so much drug use" and he was wrong to blame [Mother] and to make her raise the children alone.

Before he was incarcerated in state prison, [Father] never asked to see [Son]. He believed the child was not his. He has never seen [Son].

Trial Court Opinion, 3/31/22, at 3-6 (extraneous capitalization and record citations omitted). On March 31, 2022, the trial court granted Mother's petitions for involuntary termination of Father's parental rights to Daughter and Son. Trial Court Decrees, 3/31/22. This appeal followed.[6]

Father raises the following issues for our review:

1. Whether the trial court erred in [involuntarily] terminating [Father's] parental rights under 23 Pa[.]C.S.A. § 2511(a)(2)?

2. Whether the trial court committed an error [or] abuse of discretion in finding that the termination of [Father's] parental rights was in the child's best interest in accordance with 23 Pa[.]C.S.A. § 2511(b)?

Father's Brief at 3 (extraneous capitalization omitted).[7]

_____

[6] Father filed separate notices of appeal at trial court docket numbers 336 OC 2021 and 337 OC 2021. Although not ordered to do so, Father filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court subsequently filed its Rule 1925(a) opinion, relying on its March 31, 2022 opinion.

[7] Mother filed an appellate brief in this matter. Attorney Bianco did not file an appellate brief in this matter on behalf of the children.

Preliminarily, we must address whether Mother's petitions for involuntary termination of Father's parental rights comply with the Adoption Act, as this implicates a court's jurisdiction to hear such a petition. *See In re E.M.I.*, 57 A.3d 1278, 1284-1285 (Pa. Super. 2012) (stating, "[s]trict compliance with the Adoption Act is a prerequisite to the court's jurisdiction to hear a petition to terminate parental rights in connection with a proposed adoption"); *see also In re Adoption of K.M.G.*, 219 A.3d 662, 668 (Pa. Super. 2019) (stating, "it is foundational that jurisdictional questions may be raised *sua sponte*" (citation omitted)), *aff'd*, 240 A.3d 1218 (Pa. 2020).

Section 2512 of the Adoption Act states that a "petition to terminate parental rights with respect to a child under the age of 18 years may be filed by [e]ither parent when termination is sought with respect to the other parent." 23 Pa.C.S.A. § 2512(a)(1). Such a petition filed under Section 2512 "shall also contain an averment that the petitioner will assume custody of the child **until such time as the child is adopted**." 23 Pa.C.S.A. § 2512(b)(2) (emphasis added); *see also In re Adoption of L.J.B.*, 18 A.3d 1098, 1108 (Pa. 2011) (stating, "the sole purpose of termination is to remove any hinderance to the potential adoption of a child"). "Thus, the petitioning parent must demonstrate that **an adoption of the child is anticipated** in order for the termination petition to be cognizable." *In re Adoption of M.R.D.*, 145 A.3d 1117, 1120, 1126 (Pa. 2016) (emphasis added, citations omitted); *see also L.J.B.*, 18 A.3d at 1109 (stating that, a petition for involuntary termination of a parent's parental rights filed by another natural parent is

potentially moot when it cannot be effectuated due to the absence of an anticipated adoption of the child); ***E.M.I.***, 57 A.3d at 1285 (stating, "[e]ven when a Section 2512(a)(1) petition might satisfy the statutory requirements for termination [pursuant to Section 2511], a [trial] court still cannot grant the petition without a corresponding plan for an anticipated adoption of the child").[8]

> Section 2512(b)'s adoption requirement is consistent with the rationale behind permitting the involuntary termination of a parent's rights, which [] is to dispense with the need for parental consent to an adoption when, by choice or neglect, a parent has failed to meet the continuing needs of the child, rather than to punish an ineffective or negligent parent, or provide a means for changing the surname of the child.

***M.R.D.***, 145 A.3d at 1120 (quotation marks and citation omitted); ***see also E.M.I.***, 57 A.3d at 1286 (stating, "the Legislature intended the petition for involuntary termination of parental rights to be available solely as an aid to adoption").

---

[8] In this case, Mother, not an agency, seeks involuntary termination of Father's parental rights to the children.  Thus, under Pennsylvania law, Mother must demonstrate, *inter alia*, that adoption of the children is contemplated to establish that her petitions are cognizable.  23 Pa.C.S.A. § 2512(b); ***see also M.R.D.*** 145 A.3d at 1126.  For reasons we shall explain in greater detail herein, Mother (as the parent seeking termination) must relinquish her parental rights under 23 Pa.C.S.A. § 2711(d)(1) before the prospective adoption by Fiancé may be deemed valid.  An exception under the Adoption Act allows Mother to retain her parental rights only if a stepparent petitions to adopt the children, or if Mother can demonstrate cause for why the trial court, in its discretion, should permit noncompliance with the relinquishment of parental rights requirement.

Because a termination petition filed by one parent against the other must occur in the context of an anticipated adoption, and because adoption is a statutory right, we note that the parent seeking termination must strictly comply with all pertinent provisions of the Adoption Act in order for the adoption to be valid.

***M.R.D.***, 145 A.3d at 1120.

Pursuant to Section 2711 of the Adoption Act, a parent seeking involuntary termination of the other parent's parental rights must, *inter alia*, consent to the adoption and relinquish his or her own parental rights to the child. ***Id.***; ***see also*** 23 Pa.C.S.A. § 2711(a)(3) (stating that, "consent to an adoption shall be required" from the "parents or surviving parent of an adoptee who has not reached the age of 18 years"), 23 Pa.C.S.A. § 2711(d)(1) (stating that, a parent's consent statement shall state, *inter alia*, "I understand that by signing this consent I indicate my intent **to permanently give up all rights to this child**" (emphasis added)).[9]

_____

[9] Section 2711(d) states, in full, as follows:

**(d) Contents of consent.—**

(1) The consent of a parent of an adoptee under 18 years of age shall set forth the name, age[,] and marital status of the parent, the relationship of the consenter to the child, the name of the other parent or parents of the child and the following:

I hereby voluntarily and unconditionally consent to the adoption of the above named child.

I understand that by signing this consent I indicate my intent to permanently give up all rights to this child.

I understand such child will be placed for adoption.

I understand I may revoke this consent to permanently give up all rights to this child by placing the revocation in writing and serving it upon the agency or adult to whom the child was relinquished.

If I am the birth father or putative father of the child, I understand that this consent to an adoption is irrevocable unless I revoke it within 30 days after either the birth of the child or my execution of the consent, whichever occurs later, by delivering a written revocation to (insert the name and address of the agency coordinating the adoption) or (insert the name and address of an attorney who represents the individual relinquishing parental rights or prospective adoptive parent of the child) or (insert the court of the county in which the voluntary relinquishment form was or will be filed).

If I am the birth mother of the child, I understand that this consent to an adoption is irrevocable unless I revoke it within 30 days after executing it by delivering a written revocation to (insert the name and address of the agency coordinating the adoption) or (insert the name and address of an attorney who represents the individual relinquishing parental rights or prospective adoptive parent of the child) or (insert the court of the county in which the voluntary relinquishment form was or will be filed).

I have read and understand the above and I am signing it as a free and voluntary act.

(2) The consent shall include the date and place of its execution and names and addresses and signatures of at least two persons who witnessed its execution and their relationship to the consenter. The consent of an incarcerated parent of an adoptee may be witnessed by a correctional facility employee designated by the correctional facility. Any consent witnessed by a correctional facility employee shall list the address of the correctional facility on the consent.

Importantly, our Supreme Court explained,

Requiring parental consent to the adoption and the relinquishment of [the] parental rights [of the parent seeking involuntary termination of the other parent's parental rights] permits the child and the adoptive parent or parents to establish a new parent-child relationship. **Thus, where no new parent-child relationship is contemplated, the involuntary termination of parental rights is not permitted under the Adoption Act.**

*M.R.D.*, 145 A.3d at 1120 (quotation marks, original brackets, and ellipsis omitted; emphasis added); *see also E.M.I.*, 57 A.3d at 1286 (stating, "[t]he attendant plan for adoption serves the primary goal of the Adoption Act by placing the child in a 'new parent-child relationship' with the adoptive parent(s)").

Section 2903 of the Adoption Act provides an exception to the relinquishment of parental rights requirement prescribed by Section 2711(d)(1) whereby a petitioning parent may retain his or her parental status. Section 2903 states that, "[w]henever a parent consents to the adoption of his[, or her,] child by his[, or her,] **spouse**, the parent-child relationship between [the parent] and his[, or her,] child shall remain whether or not he[, or she,] is one of the petitioners in the adoption proceeding." 23 Pa.C.S.A. § 2903 (emphasis added). Thus,

---

(3) *In lieu* of two witnesses a consent may be acknowledged before a notary public.

23 Pa.C.S.A. § 2711(d)(1-3).

> [a]n exception to [the Section 2711(d)] relinquishment requirement exists[] in second-parent adoption cases where the adopting party **is the spouse of the parent seeking termination** - that is, in the context of a stepparent adoption. Indeed, where the parent consents to an adoption of his[, or her,] child by his or her spouse - *i.e.*, the stepparent - the consenting parent is permitted to retain his or her parental rights.

**M.R.D.**, 145 A.3d at 1120-1121 (emphasis added). This exception to the relinquishment requirement as set forth in Section 2903, however, "applies solely to 'stepparent' situations and has no application to unmarried persons."[10] **In re Adoption of R.B.F.**, 803 A.2d 1195, 1197 (Pa. 2002); **see also L.J.B.**, 18 A.3d at 1108 (stating, "where no new parent-child relationship is contemplated, the involuntary termination of parent rights is not permitted under the Adoption Act" (original quotation marks and ellipses omitted)).

In the case *sub judice*, Mother filed petitions, which were joined by Fiancé as a party-petitioner, for involuntary termination of Father's parental rights to Son and Daughter, asserting that Fiancé "loves the child[ren] and desires to adopt the child[ren]." **See** Petition for Termination of Parental

---

[10] The requirement that the prospective adoptive parent be the spouse of the parent seeking termination may seem draconian in light of the ever-evolving societal norms pertaining to what constitutes a "family." Nonetheless, such requirement is necessary to prohibit the misuse of adoption proceedings by spiteful parents seeking to involuntarily terminate the rights of unwanted parents by enlisting grandparents, cousins, friends, and a litany of other individuals having a close relationship with the child to stand in as prospective adoptive parents so that involuntary termination of the unwanted parent's parental rights may be achieved. **See M.R.D.**, 145 A.3d at 1129; **see also L.J.B.**, (stating, "the creation of parental termination absent stepparent adoption would provide parents with a new [and] dangerous[] tactic in heated custody disputes").

Rights as to Son, 10/27/21, at ¶6.; *see also* Petition for Termination of Parental Rights as to Daughter, 10/27/21, at ¶6. Mother and Fiancé also filed reports of Fiancé's intent to adopt the children, stating that Fiancé "loves the child[ren] and desires to adopt the child[ren]." *See* Report of Intention to Adopt Son, 10/27/21, at ¶3.; *see also* Report of Intention to Adopt Daughter, 10/27/21, at ¶3. In order for the petitions for involuntary termination of Father's parental rights to be cognizable by the trial court, however, Mother was required to first demonstrate by clear and convincing evidence that (1) the termination of Father's parental rights was being sought in anticipation of adoption; and (2) that she either relinquished her parental rights to the children or that the prospective adoptive parent, *i.e.*, Fiancé, was her spouse, thus negating the requirement that Mother relinquish her parental rights in anticipation of adoption. Although the pleadings filed by Mother and Fiancé collectively maintained that involuntary termination of Father's parental rights was sought in anticipation of adoption of the children by Fiancé, neither orphans court docket demonstrates that a petition for adoption was filed by Mother and Fiancé conclusively evidencing that the termination was being sought in anticipation of adoption. *See E.M.I.*, 57 A.3d at 1288 (stating, a trial court "should actually consider [a prospective] adoptive parent's intent to adopt and not merely accept [an] adoption averment on its face"). Moreover, it is clear from a review of the record that at the time of the termination hearing, Fiancé was not Mother's spouse. At the termination hearing, Mother testified that she and Fiancé became engaged in 2020, and

that their wedding was planned for some time in the fall of 2022. N.T., 3/22/22, at 29, 41 (indicating that a specific date had not been set for the wedding). Similarly, Fiancé testified that he and Mother became engaged in December 2020, but that a date for their wedding had not yet been selected. *Id.* at 59-60. Therefore, the spousal exception to the relinquishment requirement is not applicable to the case *sub judice*. **See** 23 Pa.C.S.A. § 2903; **see also R.B.F.**, 803 A.2d at 1197.

Nonetheless, when the marital status for purposes of the spousal exception to the relinquishment requirement is not satisfied, our Supreme Court has held that Section 2901 of the Adoption Act permits a trial court, in its discretion, to permit the non-compliance upon a showing of cause as to why the requirement has not been met for purposes of invoking the exception.[11] **M.R.D.** 145 A.3d at 1121. Section 2901 states as follows,

> Unless the [trial] court for cause shown determines otherwise, no decree of adoption shall be entered unless the natural parent or parents' rights have been terminated, the investigation required by [S]ection 2535 (relating to investigation) has been completed, the report of the intermediary has been filed pursuant to [S]ection 2533 (relating to report of intermediary) and all other legal

---

[11] In **R.B.F.**, **supra**, our Supreme Court relied upon Section 2901 to afford unmarried, same-sex partners (who were not permitted to marry under then-current Pennsylvania law) the opportunity to show good cause why the marital status requirement for the spousal exception should be waived where the prospective adoptive parent sought to adopt the children of his or her same-sex partner, who was the biological parent of the children. **R.B.F.**, 803 A.2d at 1201-1203.

requirements have been met.  If all legal requirements have been met, the [trial] court may enter a decree of adoption at any time.

23 Pa.C.S.A. § 2901.  Thus, "there is no reasonable construction of the Section 2901 'cause shown' language other than to conclude that it permits a petitioner to demonstrate why, in a particular case, he or she cannot meet the statutory requirements" of the Adoption Act  **R.B.F.**, 803 A.2d at 1201-1202.

Here, it is clear from the record before us that Mother and Fiancé are not married and that, as part of Mother's petitions for involuntary termination of Father's parental rights, Mother did not relinquish her parental rights to Son and Daughter in anticipation of adoption by Fiancé.  Therefore, at the outset, no new parent-child relationship was contemplated and, as such, the petitions for involuntary termination of Father's parental rights to the children were not cognizable under the Adoption Act.  Because the trial court did not consider whether Mother's petitions for involuntary termination of Father's parental rights to Son and Daughter were cognizable before addressing the underlying merits of those petitions pursuant to Section 2511, Mother was not afforded an opportunity to demonstrate by clear and convincing evidence that good cause existed, under Section 2901, to permit Mother and Fiancé to proceed with the termination petitions notwithstanding Mother's noncompliance with the legal requirements of the Adoption Act.  Like the unmarried parties in **R.B.F.**, **supra**, the opportunity to demonstrate good cause should have been extended to Mother and Fiancé.

- 15 -

Therefore, we are constrained to remand this case to permit the trial court to consider whether Mother can demonstrate by clear and convincing evidence that good cause exists, under Section 2901, to permit Mother and Fiancé to proceed with the termination petitions notwithstanding Mother's noncompliance with the legal requirements of the Adoption Act. One way Mother can satisfy her burden of satisfying the legal requirements of the Adoption Act is to marry Fiancé and file amended termination petitions averring that the legal requirements of the Adoption Act have been met. If, however, the trial court determines that Mother and Fiancé are no longer in a relationship or that Fiancé no longer intends to adopt the children, then the trial court shall dismiss this matter as moot pursuant to 23 Pa.C.S.A. § 2512. Finally, if the trial court determines that Mother and Fiancé are currently unmarried but are still in a relationship and Fiancé intends to adopt the children, the trial court shall conduct an evidentiary hearing to determine whether good cause exists to proceed with the termination petitions despite the fact that the legal requirements of the Adoption Act, and in particular the spousal exception to the relinquishment requirement, have not been satisfied.[12]

_____

[12] In exercising its discretion to determine whether there is a showing of cause for noncompliance with the requirements of the Adoption Act where the parent and the prospective adoptive parent are not married, a trial court should be mindful to examine whether the parent and prospective adoptive parent are in a committed partnership and part of the same family unit in which they are equals as between each other and are equals with respect to the children.

Consequently, for the reasons set forth herein, we vacate the March 31, 2022 decrees terminating Father's parental rights to Son and Daughter and remand this case in accordance with this memorandum.

Decrees vacated.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/8/2022

---

***M.R.D.***, 145 A.3d at 1128.  Moreover, a trial court should consider, and not merely accept on its face, a declaration of a prospective adoptive parent's intent to adopt the child, "so that the issue of whether [the parent and prospective adoptive parent] genuinely seek termination solely as an aid to adoption to thereby establish a new parent-child relationship, the singular concern of the Adoption Act, may properly be determined."  ***L.J.B.***, 18 A.3d at 1108.