J-S39014-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO A.S-A.R. AND P.N.R. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: J.L.R., NATURAL FATHER | No. 162 WDA 2014 |

Appeal from the Decrees December 27, 2013
In the Court of Common Pleas of Venango County
Orphans' Court at No(s):
O.C.D. NO. 190-2013
O.C.D. NO. 191-2013

BEFORE: BENDER, P.J.E., WECHT, J. and PLATT, J.*

MEMORANDUM BY BENDER, P.J.E.:                **FILED AUGUST 29, 2014**

J.L.R. ("Father") appeals from the decrees involuntarily terminating his parental rights to A.S-A.R. (born in April of 2002) and P.N.R. (born in May of 2000) ("Children") pursuant to 23 Pa.C.S. § 2511(a)(1), (2) and (b). We affirm.

J.A.C. (Mother) and D.R.C. ("Stepfather") filed termination petitions in which they asserted *inter alia* that Stepfather wished to adopt the Children. A hearing was held on October 1, 2013, after which the court granted the termination petitions. *See* Orphans' Court Opinion, 12/27/13. Father filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Thereafter, Father filed a Motion to Amend Concise Statement with this Court, which we granted. This Court directed that the record should be remanded to allow the trial court to file an amended Rule 1925(a) opinion responding to the additional issues raised by

_____

*Retired Senior Judge assigned to the Superior Court.

Father. The orphans' court responded in a timely fashion with a writing addressing Father's additional issue. **See** Orphans' Court Opinion, 3/12/14. The matter is now ripe for review.

Father raises three issues for our review:

1. The [c]ourt erred in determining that evidence so clear, direct, weighty, and convincing was presented to enable the fact finder to come to a clear decision without hesitancy that the natural father's parental rights should be terminated. The [c]ourt failed to consider other factors in making its determination including the nature of the relationship between the father and minor children prior to incarceration and the father's efforts to remain involved with the children while incarcerated and the natural[] mother['s] efforts to thwart the father's efforts to remain involved with the children.

2. The [c]ourt erred in determining the best interests of the children would be served by terminating the father's parental rights.

3. The [c]ourt erred when it improperly considered extremely prejudicial evidence not presented or properly before the [c]ourt and not of record in terminating the [father's] parental rights. The [c]ourt considered [father's] conviction and sentence on six commercial burglaries which occurred after the hearing and were not made part of the record as well as statements from another jurisdiction made at sentencing hearing and other evidence that was not presented or properly before the [c]ourt for consideration.

Father's brief at 4.

When considering an appeal from an order involuntarily terminating parental rights, we are guided by the following:

In cases involving termination of parental rights, our scope of review is broad. All of the evidence, as well as the trial court's factual and legal determinations, are to be considered. However, our standard of review is limited to determining

- 2 -

whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child. We have always been deferential to the trial court as the fact finder, as the determiner of the credibility of witnesses, and as the sole and final arbiter of all conflicts in the evidence. *In re S.D.T., Jr.*, 934 A.2d 703, 705-06 (Pa. Super. 2007), *appeal denied*, 597 Pa. 68, 950 A.2d 270 (2008) (citations omitted). The burden of proof in a termination case is on the petitioning party, who must establish valid grounds for termination by clear and convincing evidence.

*In re E.M.I.*, 57 A.3d 1278, 1284 (Pa. Super. 2012) (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the two comprehensive opinions authored by the Honorable Oliver J. Lobaugh of the Court of Common Pleas of Venango County, issued on December 27, 2013, and on March 12, 2014. We conclude that Judge Lobaugh's thorough, well-reasoned opinions properly dispose of the issues raised by Father. Accordingly, we adopt Judge Lobaugh's opinions as our own and affirm the decrees appealed from on that basis.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/29/2014</u>

IN THE COURT OF COMMON PLEAS OF VENANGO COUNTY,
PENNSYLVANIA

IN THE MATTER OF THE
INVOLUNTARY TERMINATION OF
PARENTAL RIGHTS TO

A. S-A. R.

~~████████████████~~ and,
~~████████████████~~, P.N.R.
MINORS.

: ORPHAN'S COURT DIVISION
:
:
:
: O.C.D. No. 190-2013
:              191-2013
:
:
:

### FINDINGS OF FACT
### OPINION OF COURT

AND NOW, this 27th day of December, 2013, the Court has for consideration the
D.R.C.
Petitions for Involuntary Termination of Parental Rights filed by the Petitioners, ~~████████~~
J.A.C.
~~████~~ and ~~████████████~~ in the above-captioned cases. A joint hearing was held thereon,

at which time the Petitioners were present and were represented by Brian Spaid, Esq. The natural
J.L.R.
father, ~~████████████~~, was also present and was represented by Matthew Kirtland, Esquire.
A. S-A. R.                              P.N.R.
The subject minor children, ~~████████████████~~ and ~~████████████~~, testified under oath

on the record in chambers and were represented by child advocate, Elissa Stuttler, Esquire. Based

upon the testimony and evidence presented at the hearing and the record, the Court makes the

following Findings of Fact by clear and convincing evidence and enters the following Opinion and

Order of Court.
A. S-A. R.
Alyssa ~~████████████~~ was born on April ● 2002, at UPMC Northwest in Venango
R.N.R.
County, Pennsylvania. ~~████████████~~ was born on May ●, 2000 at UPMC Northwest in
J.A.C.
Franklin, Venango County, Pennsylvania. Their natural mother is ~~████████████~~, date of

birth November ● 1985, and a resident of Venango County, Pennsylvania. Their natural father is
J.L.R.
~~████████████~~, date of birth April ● 1975. The Respondent is currently housed at a State

Department of Corrections facility where he will serve his Clearfield County sentence at CP-17-

1

CR-265-2012 and his Venango County sentence at CR 29-2012. At the time of the hearing the Defendant Father, was sentenced to an aggregate minimum term of imprisonment of eleven (11) years and a maximum of thirty-two (32) years for various felony and misdemeanor convictions. This did not take into account the pending charges in Venango County, Pennsylvania, based upon an alleged commercial burglary spree, wherein the father was tried on charges of Burglary, Theft by Unlawful Taking, Criminal Mischief, and Criminal Attempt to Commit Burglary in regards to multiple commercial stores, Thomas Auto Inc., Hards Welding, Whalen Contracting, Inc., Bert Klapec, Inc., R & R Garage, and 84 Lumber. Father was convicted after a trial by jury of all charges and was sentenced on December 10, 2013, by this Court to serve an aggregate sentence of a term of imprisonment of 96 months to 192 months consecutively to any and all sentences previously imposed upon this Defendant, whether in Venango County or elsewhere. *See* Sentence Order of Court, December 10, 2013, CR 29-2012.

On July 27, 2011, Father became incarcerated in the Venango County Jail and has remained incarcerated in various counties since that time to the present. Prior to his incarceration the parties shared custody on a 50/50 basis. Since Father's incarceration the subject minor children have lived *D.R.C.* *J.A.C.* with the Petitioners, ~~████████~~ and ~~████████~~, who reside at ~~████████~~, Oil City, Venango County, Pennsylvania 16301. The Petitioners filed Petitions pertaining to the *P.N.R.* *A.S-A.R.* involuntary termination of parental rights to ~~████~~ and ~~████████~~ on May 22, 2013.

The circumstances of these cases are unique with regard to the mother not permitting or allowing contact between the subject minor children and their natural father after February of 2012. This was the result of the Clearfield County District Attorney's office filing charges against the natural father, namely three counts of Criminal Solicitation to Commit Murder of the First Degree, and one count of Criminal Solicitation to Commit Aggravated Assault naming Petitioners and *J.H.* ~~████████~~ as victims. After the charges were filed, natural mother obtained a Protection from Abuse Order which prohibited contact between the natural father and the subject minor children

2

which remained in effect until natural father was sentenced under the terms of a negotiated plea for those charges on August 10, 2012, in Clearfield County. Natural father plead guilty to two counts of Criminal Solicitation to Commit Aggravated Assault, Felonies of the First Degree wherein the victims were ~~J. A. C.~~ and ~~D. R. C.~~ and one count of Terroristic Threats, a Misdemeanor of the First Degree wherein the victim was ~~J. H.~~, natural father's wife. Petitioners' interpreted correctly and justifiably relied upon the August 10, 2012, Sentence Order, as forbidding any contact between natural father and subject minor children unless there was a subsequent Order of Court, where the Court stated, "the Defendant shall have no contact with the victims, ~~J. A. C.~~ ~~D. R. C.~~ or ~~J. H.~~ or any member of their immediate families, except in regard to his biological children, as may be ordered by a court of competent jurisdiction." Pet. Ex. 1. Obviously, no Court has issued any Order of Court since the Sentence Order of August 2012, allowing contact between the natural father and subject minor children. However since August of 2012, the natural father has mailed a few cards for the children to his mother who copied them and then forwarded them to Petitioners and two $20 gift cards for Christmas 2012. The Court finds the natural father's interpretation that the Sentence Order of August of 2012 did not modify in anyway previous Custody Orders to be erroneous and unreasonable.

Elissa Stuttler, Esq. has been the Court Appointed child advocate for the Custody action between ~~J. A. C.~~ and ~~J. L. R.~~, the Custody action where the paternal grandparents sought visitation with the subject minor children, and continued in her role for these Involuntary Termination proceedings. Attorney Stuttler explained that it is her belief that it is in the best interest of the children for the Court to terminate natural father's parental rights. She believes that ~~J. L. R.~~ is unable to provide the children with the essential parental care, control or subsistence necessary for their physical and mental well-being. She stated that it would be very difficult to parent a child with a ten minute phone call or intermittent jail visits. She believes the

3

girls need immediate attention from their parents when they have problems and that their current household with the Petitioners provides them with two involved loving parents. She believes that *J.L.R.* is opposing the termination because of his own interests and not out of his love for the children. *J.L.R.* will not be in a position to potentially and effectively parent until after the girls turn eighteen. She stated that she believed that the girls are thriving in their home and that they have developed a strong bond with their step-father, *D.R.C.* She urged the Court to terminate the father's parental rights and after the girls turn eighteen they can choose whether or not they wish to have a relationship with *J.L.R.* In the meantime, the girls would be able to receive the benefit of a stable home where they feel comfortable, safe, and loved. Thus, Attorney Stuttler concluded that it is in the best interests of *P.N.R.* and *A.S-A.R.* for their natural father's parental rights to be terminated.

The Court heard from the subject minor children, Alyssa and Paige Ritchey, one at a time in chambers with counsel present. *A.S-A.R.* who goes by Aly, is eleven years old and attends 6th grade at the Oil City Middle School. She knows that her step-father wants to adopt her so that she can become his daughter. She states that she does not remember living with her natural dad, but knows that he is in jail for "being bad and stealing." She states that she does not miss her Dad and when she reads his letters she feels like she is simply reading a letter, because she has not seen him in so long. She said she would be afraid if she were suddenly to spend time with him. She is okay was her father's rights being terminated because she hasn't had contact with him for so long and he did bad things. She loves Don and he loves her. She states that he is happy and nice and plays with her, and that he's funny and nice to her mother. She has two half-siblings, *H.C.*, who is seven years old, and *B.C.*, who is thirteen years old. She sees them every other week and she shares a room with *H.C.* She calls *D.R.C.* Dad when *H.C.* and *B.C.* are not around, but is afraid to call *D.R.C.* Dad in front of them as she is afraid they will say he is not your real Dad yet. She stated that *D.R.C.* went to see her in her school play. He helps her with her math homework and her mom helps her with

4

*D.R.C.*

her English. She goes to church and youth group with her mother and ⬛ and goes school shopping *D.R.C.* and grocery shopping with both Petitioners. ⬛ makes her feel safe. She has lived there for 3-4 years.

*A.S.-A.R.*

⬛ did remember fondly going to the basketball court with her natural father, going for ice cream with him, and getting hot chocolate or cappuccinos with him before school at Sheetz. She stated that she does still love her father, but doesn't want to see him because he's done very bad things. She does not think about him very often. She said she would be scared if she saw her father, she would not want to say anything to him or hug or kiss him. She believes that if she is adopted by *D.R.C.* ⬛, she would know that she would be loved, she would have a nice family and a better life and that she would not have to come to Court anymore.

*P.N.R.*

Next, the Court heard from ⬛ who is thirteen years old and attends 8th grade at the Oil City Middle School. She stated that she gets along well with her step-father. She is on the Dance Team at school and attends church and youth group with Petitioners and her sister. She remembers visiting her natural father in jail and stated that it was not a good experience and that she does not remember her mother and natural father living together. She did enjoy playing basketball with her natural father and in the beginning of his incarceration she missed him a lot. Now she states that she does not really care anymore. She feels embarrassed when questioned by friends about her natural father's criminal proceedings and does not want to be reminded of it. She feels comfortable *D.R.C.* and safe around ⬛ and content that he cares about her and her feelings. She feels happy and *D.R.C.* *D.R.C.* excited about the prospect of ⬛ adopting her and wanted the Court to know that she wants ⬛ to "adopt her really bad." She said she would not be upset if she cannot have contact with her natural *D.R.C.* father. She stated that ⬛ feels like her real dad. He goes to her dance team events, he is patient and kind and he takes her shopping and disciplines her.

She said that before her natural father went to jail she spent a lot of time with him. She enjoyed playing basketball with him, going to pet shops, riding bikes, stopping at Sheetz on the way

5

to school and had a lot of good memories with her natural father. She said at first she missed him a lot and wrote him letters. She eventually stopped writing and said that receiving letters from him makes her sad now. She says that she will still love her natural father but that he cannot be here for her now. She said her mom does not give her all the letters from her natural father because they would hold her back and make her cry. She wants to move on and loves her life with her family including the Petitioners.

Petitioner *D.R.C.* also testified during the hearing. He is thirty-eight years of age and was born on November ● 1974. He is Caucasian and is a Christian. *D.R.C.* and *J.A.C.* Cornell were married on March 1, 2013. *D.R.C.* works as an Oil and Gas Inspector of orphan and abandoned wells. His annual salary is $52,000.00 and he receives medical, dental, and retirement benefits through his employer. He is the sole breadwinner and does not currently receive child support from *J.L.R.* . *D.R.C.* has 50/50 custody of his two children with his ex-wife *L.F.C.* His son, *B.C.* is thirteen and his daughter, *H.C.* is seven. These children also have a good relationship with *P.N.R.* and *A.S-A.R.* . *D.R.C.* explained that he has known *P.N.R.* and *A.S-A.R.* since birth as his ex-wife worked for his current wife. Four and ½ years ago they moved in with him to his 4 bedroom home in a residential neighborhood. He helps the girls with their homework, attends parent-teacher conferences, takes *P.N.R.* to and from dance team practice, and took *A.S-A.R.* to and from gymnastics when she was participating and paid the monthly fees. He provides financially for the girls: buying their food, clothes, and providing shelter for them. The family attends church at AAUP and *A.S-A.R.* and *P.N.R.* attend youth group at Oil City Community Alliance Church. He loves them, treats them as his kids, and corrects them if needed. He described a strong bond and relationship with the girls. He stated that recently, at a football game, *A.S-A.R.* ● introduced him to one of her friends as her dad. He said that in the summer of 2012 the family went to counseling at Rural Mental Health Associates and learned that the children were acting like normal kids in a blended family. He said that the girls do get some questions from friends about

6

their natural father which upsets them. Since _J.L.R.'s_ Incarceration, _D.R.C._ has provided solely for the children's educational needs, financial support, spiritual needs, physical needs, and medical needs. He believes that the children do still love their natural father, but that they do not at this time want any visits with their natural father. Currently he fears for their lives because _J.L.R._ pled guilty to Criminal Solicitation to Commit Aggravated Assault where he and his wife were the intended victims. *See* Pet. Ex. 1. He admits _J.A.C._ does not like _J.L.R._ and that she wrote _J.L.R._ a nasty letter around December or January of 2012.

Natural mother, _J.A.C._, also testified at the hearing. She is thirty-eight years of age and was born on January , 1975. She is Caucasian and is a Christian. She is married to _D.R.C._ _P.N.R._ _A.S-A.R._ . , and are her only children. She was educated at Oil City High School and attended Votech. She is currently not working due to medical problems. She was an Arby's restaurant manager for 15-20 years and was then employed at Telereach for 2 years until she quit her job to stay with her parents during September of 2012. She has recovered her health and is hoping to go back to work in the next week or two. The last time the girls saw their natural father was January of 2012. She has received approximately 24 letters for them from natural father in the past 2 and ½ years. In February of 2012, she stopped communications between the girls and their natural father as a result of the PFA order. She said that many times when the girls read the letters they received from their natural father they would be grumpy or upset. She wants _D.R.C._ to adopt the girls as he would be a good role model for them. She did plead guilty to making false reports at CR. 92-2008. She was also found guilty of false reports in Clarion County. She said she stopped the natural father's contact with the girls because she "learned that the natural father had put a hit out on her and her husband to have them murdered." She said that she did not tell the kids that her father put the hit out on them, but simply that "he wanted to hurt _D.R.C._, _J.H._, and me." _P.N.R._ learned about the charges from school and asked her mom, "if Dad said to kill you and Don did he tell the person not to hurt us? _P.N.R._ and _A.S-A.R._]." She correctly and justifiably believed that she was following the

7

Circulated 08/20/2014 09:15 AM

August 12, 2012, Sentence Order in preventing contact between natural father and children although she did allow them to have some letters and cards from the natural father. She admits that she did write a nasty letter in December or January of 2012, saying that the "girls are mine not ours" in response to a letter from ~~J.L.R.~~ thanking ~~D.R.C.~~ for providing for the girls while he was incarcerated. She believes the girls love ~~D.R.C.~~ and are happy in their home.

Father had his mother ~~S.R.~~ testify on his behalf. ~~S.R.~~ is the children's' paternal grandmother and clearly loves the girls. She testified to the close relationship she used to enjoy with the girls and the close bond between Father and the children before his incarceration and the bond between the girls and their paternal extended family. She said that she still communicates with natural father often and that he sends letters to her for the girls. She received the letters from the natural father, made a copy of them to protect ~~J.L.R.~~ and forwarded them on to the ~~J.A.C. + D.R.C.'s~~. She received two gift cards from the Clarion jail for the girls last Christmas and she went to the ~~J.A.C. + D.R.C.'s~~ to deliver them. She believes that Petitioners have put obstacles in place to prevent her son and herself from having contact with the children. She believes that father's rights should not be terminated as he has done everything that he can do from prison. She believes that contact and the relationships between the girls and their father and father's relatives should continue. She admits that ~~D.R.C.~~ is a good father figure in their lives and that he is providing for the girls medical needs, clothing, and educational needs. However, she believes that her son can still provide for the girls mentally and emotionally. She admitted that the Honorable H. William White had conducted a hearing on her petition seeking visitation with the girls and determined that at this time such visitation was not in the girls' best interest.

Lastly, natural father, ~~J.L.R.~~ testified at the hearing. Father is currently 38 years old, having been born on April ● 1975. He was married to the natural mother at the time of the birth of both subject minor children. He states that he is appealing all of his Clearfield convictions

8

on the basis of ineffective assistance of counsel. Father most recently became incarcerated on July 27, 2011.

Before his incarceration Father had a 50/50 shared custody schedule where the Father had the subject minor children from Monday to Monday every other week. He would drive them to and from school in Oil City and his home in Clarion. Almost every school morning he would stop at Sheetz on their way to get the girls hot chocolate or cappuccinos. He described the bond between himself and the girls as very strong. He reported that when he was first incarcerated in Clearfield County the girls came to visit him with ████ *J.A.C.* and that besides being upset that he was in jail, the children had a good conversation with him through the glass. He reported receiving letters from the subject minor children which stated that they missed him and the cappuccinos. His last visit with the girls was at the Venango County Jail in January of 2012. He remembers ███ *P.N.R.* wearing a corny hat and that they had a good visit.

After the soliciting murder charges, in February of 2012, the police brought him a Protection from Abuse Order which prohibited him from having contact with ████ *J.A.C.* and the subject minor children. ████ *J.A.C.* dropped the PFA in August of 2012 relying on the Sentence Order from Clarion for protection. *See* Pet.'s Ex. 1. He incorrectly interprets the Clearfield Sentence Order differently from Petitioners. He testified that he believed it read that he could resume contact with his biological children unless a subsequent Order of Court stated otherwise. Despite this belief, his only action was to begin writing letters to the subject minor children immediately after August 2012, routing them through his mother. He said the letters he received from the subject minor children stopped after the soliciting murder charges. Father claims that he did not know that he could seek visitation while incarcerated. He thought that he might be seeing the girls again in September of 2012, when he discovered that their names had been placed on his visitor's list at the jail. He understands that both girls will be over eighteen by the time he would be eligible to receive parole on his current sentences. He admits that since he's been incarcerated he has not been able to

9

provide financially for his children. However, he believes that he can still be available to provide for their emotional needs by loving the children and wanting what is best for them from the jail and being a positive influence in their lives. If his rights are not terminated he intends to file for visitation at the jail. He feels that he will be able to give the girls advice, console them, and talk to them about God through visits at the jail and letters. He admits that he cannot provide the girls with health insurance, attend parent-teacher conferences, deal with medical needs, provide clothing, food or shelter, attend doctor's appointments, or go shopping with them for school clothes.

Father has an extensive criminal history. During the hearing, evidence was admitted by the Petitioners showing father's criminal history began in 1994. *See* Pet. Ex. 2. In 2007, Father was convicted in Venango County of Receiving Stolen Property, a misdemeanor of the second degree and he was sentenced to a minimum of 12 months probation. *Id.* After his probation was revoked he was re-sentenced to a minimum of 3 months and a maximum of 12 months incarceration. *Id.* In 2010, Father was convicted in Venango County of Theft by Unlawful Taking, a felony of the third degree, and received a sentence with a minimum of 4 months and a maximum of 12 months imprisonment and was placed on consecutive probation for 36 months. *Id.* In 2012, he was resentenced after violating his probation to two years and six months to five years maximum imprisonment and 36 months of probation. *Id.* In 2012, Father was convicted in Clearfield County of four counts of Burglary, felonies of the second degree and received a minimum sentence of 4 years to a maximum of 12 years imprisonment. *Id.* This conviction was recently affirmed by the Pennsylvania Superior Court. *Commonwealth v.* J.L.R. 39 WDA 2013 (Pa. Super. Oct. 3, 2013) (non-precedential decision). In 2012, Father was also convicted in Clearfield County of two counts of Criminal Solicitation to Commit Aggravated Assault, felonies of the first degree and one count of Terroristic Threats, a misdemeanor of the first degree and he received a sentence of 4 years to a maximum of 9 years imprisonment. *Id.* This is the case where the victims were the Petitioners and Father's ex-girlfriend. The Pennsylvania Superior Court recently remanded the case "for counsel to

10

file either an advocate's brief or a brief in full compliance with *Anders* and its progeny, with an accompanying motion to withdraw and a letter advising Appellant of his rights and expressly stating counsel's desire to withdraw. Counsel must comply with our directive within 30 days of the filing date of this order, and the Commonwealth will have 30 days to respond or inform this Court that the Commonwealth does not intend to respond." *Commonwealth v.████████*, 38 WDA 2013 (Pa. Super. Sept. 25, 2013)(non-precedential opinion). Additionally, at the time of the hearing, Father was awaiting a six day trial scheduled for November 2013, in Venango County where he was accused of 16 criminal counts relating to an alleged commercial burglary spree at 6 different business locations. *Id.* After the jury trial, Father was convicted of all counts and was sentenced on December 10, 2013, to an aggregate sentence of a term of imprisonment of 96 months to 192 months which shall run consecutively to any and all sentences previously imposed upon this Defendant, whether in Venango County or elsewhere.

The Court must now address the Petitioner's Petition which seeks to involuntarily terminate father's parental rights under 23 Pa.C.S.A. §2511(a)(1) and (2), which state in relevant part:

> [t]he rights of a parent...may be terminated...on any of the following grounds: (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. §2511(a)(1) and (2). It has been determined that parental rights may be terminated where one subsection of §2511(a) is satisfied along with the provisions provided for in subsection 2511(b). 23 Pa.C.S.A. §2511(b) provides that the Court is to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). The statute further states that, "[w]ith respect to any petition filed pursuant to subsection (a)(1)...the

11

court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition" 23 Pa.C.S.A. §2511(b). The Court should also consider not just the mechanical six month period stated in subsection 2511(a)(1) but the entire background of the case. *In re Z.P.*, 994 A.2d 1108, 1177 (Pa.Super. 2010).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). In this regard, the Superior Court stated,

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. ...This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. ...Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his... ability, even in difficult circumstances. ...Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*In re Z.P.*, 994 A.2d 1108, 1177 (Pa.Super. 2010) *citing In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004). The Pennsylvania Supreme Court has recently stated in *In Re: Adoption of S.P.*, 47 A.3d. 817, 831 (Pa. 2012), "[i]n line with the expressed opinion of a majority of justices in R.I.S....we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing 'essential parental care, control or subsistence,' and the length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent,' sufficient to provide grounds for termination pursuant to 23 Pa.C.S. §2511(a)(2)." *In Re: Adoption of S.P.*, 47 A.3d at 831.

12

The Supreme Court of Pennsylvania in *In re R.I.S. & A.I.S.*, 36 A.3d 567, 576 (Pa. 2011) as

per the concurring opinion[1] of Justice Baer held that:

> There is no question that the fact of incarceration, regardless of why,
> is not in and of itself determinative of parental incapacity.
> Moreover, the fact of incarceration during an ongoing dependency
> action will not disqualify a parent from resuming parental
> responsibility so long as the parent will be released quickly enough
> to permit the court to provide the child with timely permanency
> upon reunification. If, however, the length of a parent's
> incarceration will preclude the court from unifying the (former)
> prisoner and the child in a timely basis in order to provide the child
> with the permanent home to which he or she is entitled, then the
> length of sentence, standing alone, should and does meet the legal
> criteria for involuntary termination of the incarcerated parent's
> parental rights under 23 Pa.C.S. §2511(a).

*In re R.I.S. & A.I.S.*, 36 A.3d at 576, *concurring opinion by Justice Baer.*

Justice Baer explicitly addressed termination of parental rights under Section 2511(a)(2),

stating, that "an incarcerated parent is confined twenty-four hours a day, seven days a week;

obviously resulting in his being incapable of providing the essential parental care, control or

subsistence necessary for child's physical and mental well being." *In re R.I.S. & A.I.S.*, 36 A.2d at

578, *concurring opinion by Justice Baer.* Furthermore, "[e]ach case of an incarcerated parent facing

termination must be analyzed on its own facts, keeping in mind, with respect to subsection (a)(2),

that the child's need for consistent parental care and stability cannot be put aside or put on hold

simply because the parent is doing what [he] is supposed to do in prison." *In re E.A.P.*, 944 A.2d

79, 84 (Pa.Super.2008).

The Court acknowledges that natural Father claims to want to be a parent to ████ and

████ and he has made continuous efforts to write cards to the girls despite his incarceration. As

stated in the facts hereinbefore recited, however, that has been the extent of his contact with the

girls since January of 2012. Father has not sought to compel a visitation schedule with the girls in

---

[1] Justice Baer's concurring opinion in *In re R.I.S. & A.I.S.*, 2011 WL 5865916 (Pa.) was joined in by three other
Supreme Court Justices, namely Justice Todd, Justice Castille and Justice Saylor.

13

the jail. He sporadically writes letters to the girls and did send them a gift last Christmas. He did not present any evidence that he has completed any fatherhood or anger management classes while incarcerated. The Court is also aware that despite all of father's averments that he desires to maintain a strong bond with the girls, he still has not only a past of consistent re-incarceration due to being convicted of the numerous offenses listed hereinbefore and a revocation of probation, but was recently convicted of six commercial burglaries which substantially increased the already lengthy prison sentence Father is serving. Father currently will not be eligible for parole until 2030.

A.S-A.R.    P.N.R.

_____ and _____ will both be over the age of eighteen when their Father becomes eligible for parole. In fact, A.S-A.R. _____ would be twenty-eight (28) years old and P.N.R. _____ would be thirty (30) years old. If Father is not released from the Department of Corrections until his current maximum date, A.S-A.R. _____ will be fifty-nine (59) years old and P.N.R. _____ will be sixty-one (61) years old. If the Court does not terminate father's parental rights at this time and allow their step-father to adopt them, it will mean that the girls will have spent the rest of their lives as minors without the presence and permanency of having a father and mother who are both able to provide essential daily parental care, control and subsistence that is necessary for a child's physical and mental well-being. This result would be in direct contradiction to the goal and purpose of seeking the child's best interest. As Justice Baer stated:

> It is incumbent upon the judicial system to be child-focused. Regardless of the heartbreak to the parent, children are entitled to every opportunity for a successful life, and a permanent, loving parental relationship greatly foster that opportunity. *See e.g. In re. B.N.M.,* 856 A.2d 847, 856 (Pa. Super. 2004) (holding that a parent's rights must yield "to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, health, safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have them terminated")

*In re R.I.S.,* 36 A.2d at 579. This Court will remain child-focused.

According to the statute, the Court must first find that sufficient evidence exists to establish that an involuntary termination of parental rights under subsection (a) has been met. The Court is satisfied that the Petitioners have proved by clear and convincing evidence that J.L.R. _____

14

●, the natural father, has refused or failed to perform his parental duties for a period of at least six months and that, as a result of father's incarceration and the length of father's remaining confinement, there is a continued Incapacity that has caused and will continue to cause *A. ●-A.R.* and *P.N.R.* ● to be without essential parental care, control or subsistence necessary for their physical and mental well-being that cannot be remedied in a timely manner. 23 Pa.C.S.A. §2511(a)(1)&(2).

Once the Court finds that the statutory requirement under subsection (a) has been met, the Court must next determine whether the child's needs and welfare will be met by termination under subsection (b). In considering the emotional needs and welfare of the child, "the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re C.S.*, 761 A.2d 1197, 1202 (Pa.Super. 2000). "Above all else the court must give adequate consideration to the needs and welfare of the child." *In re Adoption of K.J.*, 936 A.2d 1128, 1134 (Pa.Super. 2007) *citing In re J.D.W.M.*, 810 A.2d 688, 690 (Pa. Super. 2002).

*A.●-A.R.*   *P.N.R.* ● and ● have lived exclusively with Petitioners since their natural Father's incarceration in July of 2011. Although, they did live with natural mother and their maternal grandparents during September of 2012, to keep the girls away from the headlines and articles in the newspaper about their father being in trouble. The Child Advocate confirmed that a strong, primary bond exists between the girls and Petitioners. Every witness who testified during the hearing, even natural Father, told the Court how *D.R.C.* ●has been providing for the girls physical, financial, emotional, spiritual, and mental needs. The girls have a happy, healthy, stable *J.H.C.+D.R.C.*   *D.R.C.* and safe life with the ●family. Both girls wish to be adopted by ● and desire to feel comfortable calling him Dad when their half-siblings are around. To deny them this sense of security and belonging to satisfy their natural Father's desire for a relationship with them would not be in the best interests of the children.

15

As was stated above, "[i]t is incumbent upon the judicial system to be child-focused. Regardless of the heartbreak to a parent, children are entitled to every opportunity for a successful life, and a permanent, loving parental relationship greatly fosters that opportunity." *In re R.I.S. & A.I.S.*, 36 A.2d at 579, *concurring opinion by Justice Baer*. Petitioner [D.R.C.] conveyed his strong desire to adopt [P.N.C.] and [A.S-A.R.] and provide them with the permanent and stable environment that these children deserve. Father is not able to provide that environment for [P.N.C.] and [A.S-A.R.] for *at least* another seventeen years at which point both girls will no longer be minors.

Therefore, the Court also finds by clear and convincing evidence that any bond that may continue to exist between natural Father [P.N.C.], and [A.S-A.R.] is greatly outweighed by the strong current bond between [P.N.C., A.S-A.R., J.A.C., D.R.C.] and that terminating Father's rights is in the best interest of [P.N.C.] and [A.S-A.R.'s] physical and emotional well-being.

Additionally, under 23 Pa. C.S.A. §2511 (9), the rights of a parent to a child may be terminated after a petition filed on the grounds that, "the parent has been convicted of one of the following in which the victim was a child of the parent: (1) an offense under 18 Pa. C.S. Ch. 25 (relating to criminal homicide); (ii) a felony under 18 Pa. C.S. §2702 (relating to aggravated assault); ... (iv) an attempt, solicitation or conspiracy to commit an offense in subparagraph (i),(ii) or (iii)." The Petitioners did not seek to terminate natural father's rights under this section as it does not directly apply to the situation. However, the Court does find it pertinent that natural Father was convicted of Criminal Solicitation to Commit Aggravated Assault against both the subject minor children's natural mother and their step-father with whom the minor children live. In the Opinion of Court by the Honorable Fredric J. Ammerman, he held:

> While incarcerated, Defendant attempted to hire a fellow inmate to kill his ex-wife, her boyfriend [now her husband], and his current wife. He provided the potential hitman with information concerning the layout and address of his current wife's home, and the address and information relating to his ex-wife's home and habits. The inmate-turned-informant relayed that Defendant would inquiry[sic.] about his willingness to perform the murders every time the two spoke....While incarcerated, he threatened the lives of three people, including his wife and ex-wife, and arguably the lives of his children. He was also persistent

16

in his pursuit to have these people killed or maimed. During his sentencing in this matter, Defendant's ex-wife spoke to the Court of her fear for her life as well as her children's lives. Tr. Sentencing, 3-6, Aug. 10, 2012. Further, Defendant never expressed any regret, remorse, or apology to those he was intending to have harmed. Tr. Sentencing, 12-15, Aug. 10, 2012. He only accuses his ex-wife of previously filing false reports against him and lying to police officers. Tr. Sentencing, 12, Aug. 10, 2012. The Court finds that Defendant is dangerous, has a history of criminal activity, offers no remorse for these crimes, and that the nature of the crimes was particularly troubling due to his strong desire to go forward with his proposed killings.

*J.L.R.*

*Commonwealth v.* ████████, CP-17-CR-265-2012, P.4-6 (C.P. Clearfield Cty 2013) (Opinion of Court dated May 3, 2013). While the victims of natural Father's Criminal Solicitation to Commit Aggravated Assault Convictions are not the subject minor children, father did indirectly endanger the welfare of the children, *A.S.A.R.* ████ and *P.N.R.* ████ lived in the home that natural Father was providing information about to the "potential hit man" and should he have succeeded in incapacitating their natural mother and step-father he would have left the subject children without essential parental care, control or subsistence necessary for their physical or mental well-being. He placed the subject minor children in fear for their own lives as evidenced by *R.N.R.'s* ████ question upon learning at school about the charges, "If Dad said to kill you and *V.R.C.* ████ did he tell the person not to hurt us?" These are not the actions of a man who has his daughters' best interest at heart and did victimize his subject minor children. These actions belie his claims of desiring to lovingly parent the subject minor children.

Therefore, the Court finds that the Petitioners have established by clear and convincing evidence that, for a period of six months preceding the filing of the Petitions, Respondent has refused or failed to perform his parental duties as required in 23 Pa.C.S.A. §2511(a)(1) and has evidenced a repeated and continued incapacity that has left the children without essential parental care, control or subsistence necessary for his physical and mental well-being as required by 23 Pa.C.S.A. §2511(a)(2). The Court also finds that the Petitioners have established by clear and convincing evidence that the developmental, physical and emotional needs and welfare of the

17

Circulated 08/20/2014 09:15 AM

J. L. R.

children are best met by involuntarily terminating the parental rights of the natural father, ▓▓▓▓▓

▓▓▓▓▓▓ as required by 23 Pa.C.S.A. §2511(b). An appropriate order shall follow.

BY THE COURT,

_____
OLIVER J. LOBAUGH, President Judge

cc: Brian Spald, Esq.
   Matthew T. Kirtland, Esq.
   Elissa Stuttler, Esq.

18

IN THE COURT OF COMMON PLEAS OF VENANGO COUNTY,
PENNSYLVANIA

|  |  |
|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO | : ORPHAN'S COURT DIVISION : : |
| *A. S-A.R.* and, *P.N. R.* MINORS, | : O.C.D. No. 190-2013 : 191-2013 : : |

### ORDER OF COURT

AND NOW, March __/2__, 2014, the Court has for consideration the Amended Statement of Matters Complained of on Appeal filed by the natural father, _J.L.R._ on February 24, 2014. The natural father has appealed to the Superior Court of Pennsylvania from this Court's Order dated December 27, 2013. The Court filed its original 1925 (a) opinion on January 27, 2014. The Clerk of the Orphans' Court Division-Court of Common Pleas of Venango County certified and transmitted the record in the above-captioned case to the Pennsylvania Superior Court on February 4, 2014. On February 3, 2014, Appellant filed a Motion to Amend Concise Statement of Matters Complained of on Appeal with the Pennsylvania Superior Court seeking to raise additional matters in the appeal. The Pennsylvania Superior Court granted Appellant's Motion to Amend Concise Statement of Matters Complained of on Appeal on February 10, 2014 and remanded the record for thirty days for the Appellant to file an amended Pa. R.A.P. 1925 (b) Concise Statement of Matters Complained of on Appeal and ordered this Court to prepare and file a Pa. R.A.P. 1925 (a) in response. Pursuant to Pa.R.A.P. 1925(a), this Court shall state its reasons for the Order in question.

1

In his Statement, the Petitioner sets forth three (3) matters complained of from which the following is taken verbatim:

1. The Court erred in determining that evidence was so clear, direct, weighty, and convincing was presented to enable a fact finder to come to a clear decision without hesitancy that the natural father's parental rights should be terminated. The Court failed to consider other factors in making its determination including the nature of the relationship between the father and minor children prior to incarceration and the father's efforts to remain involved with the children while incarcerated and the natural mother's efforts to thwart the father's efforts to remain involved with the children.

2. The Court erred in determining the best interests of the children would be served by terminating the father's parental rights.

3. The Court erred when it improperly considered extremely prejudicial evidence not presented or properly before the Court and not of record and placed significant weight on the evidence to terminate Petitioner's parental rights. The Court considered Petitioner's conviction and sentence on six commercial burglaries which occurred after the hearing and were not made part of the record as well as statements from another jurisdiction made at sentencing hearing and other evidence that was not presented or properly before the Court for consideration.

Pet.'s Amended Statement of Matters Complained of on Appeal, ¶ 1-3. This Court adequately dealt with the first two issues raised by the natural father in this matter in its Opinion and Order of Court dated December 27, 2013.

Petitioner's third contention alleges that the Court erred by considering extremely prejudicial evidence not presented or properly before the Court and not of record and by placing significant weight on that evidence in coming to the determination to terminate natural father's paternal rights. If the Superior Court were to determine that the Court erred in considering evidence of court cases outside of the instant involuntary termination proceeding, it would be harmless error as this Court did not put significant weight on any of the challenged evidence in coming to the determination to terminate natural father's parental rights.

In general, "[i]t is well established that a court may not ordinarily take judicial notice in one case of the records of another case, whether in another court or its own, even though the

2

contents of those records may be known to the court." *Naffah v. City Deposit Bank, et. al.*, 13 A.2d 63, 64 (Pa. 1940). Therefore, "a court is admonished not to take judicial notice of the record of another case, if not pleaded." *Woodman v. Burton*, 498 A.2d 445, 448 (Pa. Super. 1985). However, in 1994, the legislature adopted, 207 Pa. Code § 202 which provides guidance for citing of Opinions of Other Courts. Section 202 states:

> Reported opinions of the Supreme Court, Superior Court and Commonwealth Court may be cited as binding precedent on Pennsylvania law. Reported opinions of the courts of common pleas, federal courts and courts of other jurisdictions may be cited for their persuasive value. Unreported opinions of other courts shall not be cited in any brief or argument addressed to the Court. The Court may, however, *upon the request of a party*, take judicial notice of unreported opinions of other courts involving facts or parties relevant to the matter before the Court.

207 Pa. Code § 202, *emphasis added*. Pursuant to Pennsylvania Rule of Evidence 201 (b),

> the court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Pa. R. E. Rule 201 (b). Additionally, Judicial Notice may be taken by the Court on its own, but *must* be taken "if a party requests it and the court is supplied with the necessary information. Pa. R. E. Rule 201 (c), *emphasis added*. The Comment to Rule 201 defines adjudicative facts as "facts about the events, persons and places relevant to the matter before the court. *See* 2 McCormick, *Evidence* § 328 (6th ed. 2006)." Pa. R. E. 201, *comment*.

Petitioner is particularly concerned at this Court's consideration of Petitioner's conviction and sentence on six commercial burglaries which occurred after the involuntary termination hearing and were not made part of the record. Petitioner's criminal history was relevant to the involuntary termination proceeding and counsel for the natural mother asked the Court to take judicial notice of his record. During his direct examination of the natural mother's husband, D.R.C. █████████████ the following exchange took place:

3

Q.    He was found guilty or pled guilty to charges in Clearfield County, correct?

A.    Yes.

Q.    In fact, in Clearfield County was he found guilty of four counts of Felony Criminal Trespass/Burglary/Breaking into a Structure?

A.    To my knowledge, yes.

Q.    Two counts of Misdemeanor Criminal Mischief that damaged property?

A.    Yes.

Q.    And a Theft by Unlawful Taking/Criminal Mischief, correct?

A.    Correct.

Q.    He then pled no-contest to the Criminal Solicitation—excuse me, I apologize. He pled guilty to the Criminal Solicitation to Commit Aggravated Assault, correct?

A.    Yes.

Q.    And also to Terroristic Threats?

A.    Right.

Q.    Is it your understanding that based on all of those charges that he was sentenced to a term in prison, at this point in time a minimum of eight years and a maximum of twenty-five years?

A.    Yes.

Q.    And he currently has charges pending relative to criminal activity here in Venango County, correct?

A.    Correct.

Q.    And those include numerous charges of burglary and theft, basically with different counties, correct?

A.    Right, yes.

(Petitioner Exhibits #2, #3, and #4 marked for identification)

MR. SPAID:   Your Honor, I have marked as Petitioner's Exhibits #2, #3, and #4, information off of the Internet, the portal website that provides you criminal docket information. Exhibit #2 says, "Venango County Court of Common Pleas" at the top and it is actually a court summary of all of the various charges that were filed against ▓▓▓▓▓▓▓ at times in Clarion, Venango, and Clearfield counties and the disposition of all of those charges.

Exhibit #3 is the docket from the case in Clearfield County involving criminal solicitation, and Exhibit #4 is the docket here from Venango County so that would could explain to the Court the current status of that case.

I would ask the Court to take judicial notice and therefore admit Exhibits #2, #3, and #4 into evidence.

THE COURT: Any objection?

MR. KIRTLAND: I have no objection, Your Honor.

MRS. SHARP: No objection.

THE COURT: Petitioner's Exhibits #2, #3, and #4 are admitted.

Involuntary Termination Tr.115: 23-118: 9 (Oct. 1, 2013). The Court was additionally asked to take judicial notice of the Sentence and Order of Court from Clearfield County during natural mother's counsel's direct examination of ▓▓▓▓▓▓▓▓▓▓▓▓▓ *See,* Petitioner's Ex. # 1.

4

(Petitioner Exhibit #1 marked for identification)

Q.    I am going to show you what we have marked as Petitioner Exhibit #1. Is that the Sentence Order from Clearfield County in August of 2012?

A.    Yes.

Q.    I am going to turn to the second page. And in this he pled guilty to Criminal Solicitation to Commit Aggravated Assault, a Felony 1, correct?

A.    Yes.

Q.    And on the second page at the top at the end of the paragraph that runs over from the first page there is a provision that reads, "The defendant shall have no contact with the victims, ████████████, ████████████, or ████████████ or any member of their immediate families, except in regard to his biological children as may be ordered by a Court of competent jurisdiction."

Q.    And this was a Sentence that was entered in Clearfield County in August of 2012, correct?

A.    Yes.

Q.    To your knowledge, has any modification been made to that contact provision concerning you and ████████?

A.    No.

Q.    And your immediate family?

A.    No.

        MR. SPAID:  I move for the admission of Exhibit #1 into evidence, Your Honor.

        THE COURT:  Any objection?

        MS. SHARP:  No objection?

        MR. KIRTLAND:  No objection.

        THE COURT: Petitioner's #1 is admitted.

Involuntary Termination Tr. 109:16-111:3 (Oct. 1, 2013). The natural father also testified to the length of his sentence at the time of the hearing and the upcoming jury trial for the burglary charges. He told the Court that he was appealing his Clearfield convictions. Involuntary Termination Tr. 222:17-223:14 (Oct. 1, 2013). When asked about his current sentences, natural father admitted that the total of his sentence as of October 1, 2013, was eleven to thirty-two years and that he was awaiting trial next month for the burglary charges in Venango County. Id., 223:15-24. In her role as court appointed child advocate Elissa Stuttler, Esq. also questioned natural father about his criminal record and the sentences he was facing and how his incarceration affected his ability to provide for his children.

Q.    But you are not going to be able to be there for these girls?

A.    Physically no.
Q.    For at least the next eleven years?
A.    That is the worst case.
Q.    No. That's at least; because you still have charges in Venango County. You haven't been sentenced and certainly haven't been tried either.
A.    I am innocent until proven guilty.
Q.    Exactly.
A.    You are putting the cart before the horse.
Q.    No. I said it would be eleven years at least. We don't know about these charges in Venango, do we? So it is at least eleven years.
A.    Okay, correct.

Id., 238:6-19. On re-direct Attorney Kirtland clarified with the natural father that he had already served about two years of his eleven year aggregate minimum sentence, so that he had about nine years left to serve on his aggregate minimum at the time of the involuntary termination hearing. Id., 238:25-239:7. After the involuntary termination hearing, this Court conducted a five day jury trial with the natural father as defendant on the burglary charges in Venango County. After a trial a jury of his peers found him guilty of every count. This Court sentenced the defendant on December 10, 2013, to an aggregate sentence of 96 months to 192 months to be served consecutively to any and all sentences previously imposed upon the defendant at the Venango County term-number that the Court was requested to take judicial notice of by Attorney Spaid and without objection by the natural father at the involuntary termination hearing.

In this Court's Opinion of December 27, 2013, the Court distinguished between the length of time defendant was sentenced to serve at the time of the hearing, an aggregate minimum term of imprisonment of eleven (11) years and a maximum of (32) years; and the additional sentence Defendant received from this Court on December 10, 2013 of 96 months to 192 months consecutively to any and all sentences previously imposed upon this Defendant. *In the Matter of the Termination of Parental Rights to* ▮▮▮▮▮▮ *and* ▮▮▮▮▮▮, Civ. No. 190-2013, 191-2013 (C.P. Venango Cty 2013), P. 2. This Court included the resolution of the

6

natural father's Venango County criminal case for commercial burglaries, which the Court was directed to take judicial notice of by the parties, because the "length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." *In Re: Adoption of S.P.*, 47 A.3d 817, 831 (Pa. 2012)(Which further stated, "we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the questions of whether a parent is incapable of providing 'essential parental care, control or subsistence'...sufficient to provide grounds for termination pursuant to 23 Pa. C.S.A. §2511 (a)(2). Including the new sentence illustrated and emphasized that the natural father will be incarcerated even at a minimum long after the girls reach the age of majority.

However, if the Superior Court were to conclude that consideration of the sentence received for the burglary charges after the conclusion of the involuntary termination hearing was improper, this Court would still find that its holding that "[i]f the Court does not terminate father's parental rights at this time and allow their step-father to adopt them, it will mean that the girls will have spent the rest of their lives as minors without the presence and permanency of having a father and mother who are both able to provide essential daily parental care, control and subsistence that is necessary for a child's physical and mental well-being. This result would be in direct contradiction to the goal and purpose of seeking the child's best interest." *In the Matter of the Termination of Parental Rights to* A.S-A.R. *and* P.N.R., P. 14. Based on the length of the sentences natural father was serving at the time of the involuntary termination hearing, A.S-A.R. and P.N.R. would still both be over the age of eighteen when their natural father was eligible for parole as of the date of the involuntary termination hearing. A.S-A.R. would be twenty years old and P.N.R. would be twenty-two years old. If natural father is not released from

7

the Department of Corrections until his maximum date, prior to receiving the sentences for the commercial burglaries committed in Venango County, ██████ would be forty-one years old and ██████ would be forty-three years old. This length of incarceration is also sufficient considering that "an incarcerated parent is confined twenty-four hours a day, seven days a week; obviously resulting in his being incapable of providing the essential parental care, control or subsistence necessary for child's physical and mental well being" and this natural father's incarceration will continue well past the time when his daughters become adults, *In re R.I.S. & A.I.S.*, 36 A.2d 567, 578 (Pa. 2011)(concurring opinion by Justice Baer). Thus, this Court respectfully states that if it erred in considering the resolution of natural father's Venango County criminal case, it was harmless error as the length of incarceration facing natural father at the time of the involuntary termination hearing was more than sufficient for the Court to come to the same decision about termination of natural father's rights. The sentence from the natural father's Venango County commercial burglaries case was not extremely prejudicial to the defendant as both parties referenced the case throughout the involuntary termination hearing and the Court was already aware of the charges and the potential sentence that natural father would be facing if convicted of those charges. Moreover, the Court did not reach the determination that the natural father's parental rights should be terminated solely on the basis of the natural father's incarceration but as one factor among several.

Petitioner also contends that the Court should not have considered, "statements from another jurisdiction made at sentencing hearing and other evidence that was not presented or properly before the Court for consideration." This Court quoted a portion of an opinion by the Honorable Frederic J. Ammerman which dealt with natural father's Clearfield County convictions for criminal solicitation to commit aggravated assault and terroristic threats. *Commonwealth v.*

8

*J.L.R.*

~~*[redacted]*~~, CP-17-CR-265-2012, P. 4-6 (C.P. Clearfield Cty 2013)(Opinion of Court dated May 3, 2013). The Court was directed to take judicial notice of the docket sheets of natural father's Clearfield County cases and the docket sheets were admitted into evidence without objection by natural father's counsel. Judge Ammerman's opinion of May 3, 2013, is listed on the docket sheet. His opinion is publically available as part of the public record. Both parties testified extensively throughout the hearing specifically about Judge Ammerman's Sentencing Order and their individual interpretations of the no contact provision which was Petitioner's Ex. 1. The information quoted from Judge Ammerman's opinion was not extremely prejudicial to the Defendant as the information contained in Judge Ammerman's opinion had already been elicited

*R.N.R.*       *J.H.C.*       *D.R.C.*

from the daughter ~~*[redacted]*~~, natural mother ~~*[redacted]*~~, husband ~~*[redacted]*~~,

*S.R.*

natural father's mother, ~~*[redacted]*~~, and from natural father himself. Thus, if the Pennsylvania Superior Court would find that it was error for this Court to refer to the Opinion of Court of the Honorable Fredric Ammerman, it was harmless error as it did not provide the Court with any new information not known to the Court at the close of the involuntary termination hearing.

BY THE COURT,

_____

OLIVER J. LOBAUGH, President Judge

cc:    Matthew Kirtland, Esq.
       Brian Spaid, Esq.
       Elissa Stuttler, Esq.