J-S66002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: B.N.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.H. | |
| | No. 372 MDA 2016 |

Appeal from the Order Entered January 29, 2016
In the Court of Common Pleas of Berks County
Orphans' Court at No(s): 83789

BEFORE:  BOWES, PANELLA AND JENKINS, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED OCTOBER 19, 2016**

K.H. ("Paternal Grandmother") appeals from the January 29, 2016 order denying her petition to adopt her now-five-year-old granddaughter, B.N.M.  We affirm.

The trial court succinctly summarized the underlying facts and procedural history as follows:

> B.N.M. was born [during] October . . . 2011[,] at the Reading Hospital[.]  Due to Mother's drug use, B.N.M. was born prematurely and addicted to methadone. To this day, B.N.M. suffers from exotropia, Bell's palsy and developmental delays in motor development and speech.  At the time of B.N.M.'s birth, Mother listed E.D. [("Legal Father")] as the father on the birth certificate. However, . . . Paternal Grandmother . . . believed that her son A.L. [("Biological Father")] was the child's true biological father.  [Biological Father] also has a six-year-old son by Mother, E.M.[,]  [who] is currently in the custody of Paternal Grandmother.  B.N.M. was in the custody of her drug addicted Mother and Legal Father until the summer of 2013, living in four

different motels and various drug houses. B.N.M. was without proper supervision, sufficient food and hygiene for most of that time. Mother was arrested in July 2013 on several felony charges and when it became apparent that Legal Father was unable to care for B.N.M. due to his own drug rehabilitation status, Berks County Children and Youth Services (hereinafter "BCCYS ") gained physical and legal custody of the child through a voluntary thirty day placement[.] BCCYS approached Grandmother at that time to ask if she would take temporary custody of B.N.M. but she declined because she was currently overwhelmed with caring for B.N.M.'s brother E.M., who is autistic. Legal Father asked that B.N.M. be placed temporarily with . . . T.Mu., who ultimately became B.N.M.'s Foster Mother.

At the expiration of the thirty day placement, BCCYS filed a Petition for Dependency. On September 4, 2013, the [juvenile court] adjudicated B.N.M. dependent and granted physical and legal custody to BCCYS. At that point, [the juvenile court] confirmed continued placement with . . . C.Mu. and T.Mu. [("Foster Parents")]. Grandmother and her paramour, M.T-C., later applied as a kinship resource for B.N.M., but were denied.

. . . .

During the dependency case process, [the juvenile court] held status hearings and permanency review hearings to review Mother's progress toward a possible reunification with B.N.M. Each time, [the juvenile court] confirmed the child's continued placement with . . . Foster Family as she was thriving in that environment and Mother continued to move from rehab to jail to a psychiatric hospital. Grandmother attended most of the hearings with her paramour M.T-C. . . . Grandmother repeatedly requested that B.N.M, be placed with her and also asked for visitation. Although [the juvenile court] declined to place the child with Grandmother, she was granted supervised visits with B.N.M. at which the child's biological brother E.M. attended in order to allow the siblings to interact.

DNA testing in fall 2013 determined that [Biological Father], and not [Legal Father], was the biological father of B.N.M. [Biological Father relinquished] his parental rights on December 7, 2013, stating repeatedly to BCCYS staff that he wished for B.N.M. to be adopted by the Foster Parents and not

by any of his biological family because of the abuse he allegedly suffered at their hands. Mother and Legal Father's parental rights were terminated by the [orphans' court] on November 26, 2014[.] [Biological Father] attended the hearing solely to reiterate his desire that B.N.M. never be placed with any of his relatives.

. . . .

After parental rights were terminated, . . . three competing parties [,*i.e.*, Grandmother, Great Aunt[1], and Foster Parents,] filed [adoption petitions.] . . . Grandmother's paramour did not join in her petition [.]

. . . .

The three adoption hearings were [initially] scheduled for November 2015 but . . . [t]he hearings were held before [the orphans' court[2]] on January 26 and 27, 2016. . . . The parties did not request that the Court interview the child. . . . On January 29, 2016, [in separate orders] the [orphans'] [c]ourt granted Foster Parents' Petition for Adoption and denied Grandmother's and Great Aunt's petitions[.] Grandmother [filed a timely appeal] on February 29, 2016. [On January 29, 2016, the orphans' court entered a formal adoption decree in favor of Foster Parents].

Trial Court Opinion, 4/15/16, at 2-6

Grandmother presents three questions for our review.

1. Has the Honorable Trial Court erred in granting an adoption by following the recommendation of Berks County Children and Youth and severing the bond between paternal

---

[1] The appeal of Great Aunt was listed consecutively with the instant matter. We address that appeal in a separate writing.

[2] Different judges presided over the dependency proceedings in the juvenile court and the adoption proceedings in the orphans' court.

grandmother and the child's sibling that resides with the grandmother ?

2. Has the Court of Common Pleas committed an error of law by utilizing 62 PS § 1302.2 "Discontinuance of Family Finding" in this case, by issuing an Order on January 14, 2[0]15, wherein, "BCCYS shall not assess relatives presenting for the child pursuant to 62 P[S] [§]1302.2 ?"

3. Did the Trial Court commit an error by not considering Fostering Connections and Family Finding by granting the adoption to a foster family?

Grandmother's brief at 3.

Appellate review of an adoption decree is as follows:

When reviewing a decree entered by the Orphans' court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' court sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

*In re E.M.I.*, 57 A.3d 1278, 1284 (Pa.Super. 2012) (citation omitted).

The polestar of adoption proceedings is the best interest of the adoptee. Pursuant to 23 Pa.C.S. § 2902(a), the trial court must determine whether the proposed adoption would promote the child's needs and welfare. That *proviso* is as follows:

If satisfied that the statements made in the petition are true, that the needs and welfare of the person proposed to be adopted will be promoted by the adoption and that all requirements of this part have been met, the court shall enter a decree so finding and directing that the person proposed to be adopted shall have all the rights of a child and heir of the adopting parent or parents and shall be subject to the duties of a child to him or them.

- 4 -

23 Pa.C.S. § 2902(a). Moreover, in § 2724, relating to testimony and investigations, the Adoption Act further elucidates that the child's best interest is the only relevant factor in determining whether to grant or deny an adoption petition. Specifically, § 2724(b) provides in pertinent part, "In any case, the age, sex, health, social and economic status or racial, ethnic or religious background of the child or adopting parents shall not preclude an adoption but the court shall decide its desirability on the basis of the physical, mental and emotional needs and welfare of the child."

While it is difficult to discern Grandmother's precise complaints from the assertions that she levels in her brief, she criticizes BCCYS and the juvenile court for their respective actions during the dependency proceedings. Our scope of review of the order denying her petition for adoption is limited to the testimony and evidence adduced during the evidentiary hearings relating to the competing petitions for adoption. ***In re Adoption of Farabelli***, 333 A.2d 846, 849 (Pa. 1975) ("scope of our review on this issue is limited to consideration of the testimony and the determination as to whether the Court's findings are supported by competent evidence"). Thus, to the extent that Grandmother challenges the merits of the agency's stewardship during the dependency proceedings or the juvenile court's prior decisions, those claims are unavailing herein.

With the aforementioned legal precept in mind, we note that Grandmother's second and third issues relate to a juvenile court order that was entered on January 14, 2015, and a BCCYS decision regarding the placement of B.N.M. with Foster Parents rather than kinship care with her. As we discuss below, since both of these assertions involve juvenile court proceedings that do not implicate the orphans' court hearing or its determination whether the proposed adoption would promote B.N.M.'s needs and welfare, they fail as a matter of law. **Farabelli**, **supra**.

Grandmother asserts that the juvenile court's January 14, 2015 permanency review order, which is not in the certified record that was transmitted to this court, effectively eliminated her as an adoptive resource by relieving BCCYS of its obligation to assess her for kinship placement during the dependency proceedings. In short, she contends that the juvenile court's endorsement of the agency's decision-making was a harbinger of the orphans' court's subsequent decision to deny her adoption petition one year later. As noted, *supra*, since Grandmother did not appeal the juvenile court order, or assert a related claim during the subsequent adoption proceedings before the orphans' court, the issue is waived. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Moreover, as discussed, *infra*, the record sustains the orphans' court's merits determination to deny Grandmother's petition for adoption based upon the evidence adduced

during the evidentiary hearing. Thus, to the extent that Grandmother asserts that the juvenile court erred in sustaining the agency's refusal to consider her as a kinship resource, that claim is fruitless.

For similar reasons, Grandmother's complaints regarding the agency's refusal to place B.N.M. in her care during the dependency proceedings are also ineffective. First, since Grandmother did not challenge the agency's decisions before the juvenile court, the fact that the agency favored Foster Parents as placement resources during the dependency proceedings is not before us in this appeal. More importantly, even recognizing that a petitioner's genetic relationship with the child is a relevant consideration that the orphans' court must address in deciding to grant or deny a petition for adoption, the orphans' court factored into its consideration Grandmother's relationship with B.N.M. and her care of B.N.M.'s older brother and nevertheless concluded that Grandmother's proposed adoption of B.N.M. was not in the child's best interest. *In re Adoption of D.M.H.*, 682 A.2d 315, 319 (Pa.Super. 1996) ("the trial court properly evaluated the familial relationship between grandmother and child by making the relationship a relevant, but not a controlling, consideration."). Thus, no relief is due.

The final claim we review relates to the merits of the orphans' court's decision to deny Grandmother's adoption petition. As noted, *supra*, the orphans' court determined that the proposed adoption would not promote B.N.M.'s needs and welfare. *See* Trial Court Opinion, 4/15/16, at 17 ("there

is substantial and compelling evidence that granting Grandmother's [p]etition for [a]doption . . . is not in the child's best interest as the [propsed adoption] would not suit [her] physical, mental, and emotional needs and welfare[.]"). Grandmother challenges the trial court's factual findings and assails the manner in which the orphans' court weighed the evidence that she adduced during the hearing. Specifically, Grandmother disputes the court's findings that she was inattentive to B.N.M.'s plight during the dependency proceedings, that she spearheaded the hostile campaign against Foster Parents involvement with the child by administering a Facebook page titled, "Bring [B] Home," and that B.N.M. does not have a relationship with her older brother, who is in Grandmother's custody. **See** Pretrial Memorandum, at Exhibit L.

Consistent with our standard of review, we reject Grandmother's invitation to revisit the orphans' court's factual findings that are supported by the certified record. **See In re E.M.I.**, **supra** at 1284. Tellingly, as it relates to Grandmother's credibility, the trial court found her untrustworthy. The orphans' court observed,

> While the Court believes Grandmother's claim that she loves B.N.M., the rest of Grandmother's testimony was not credible and, frankly, was fantastical and confusing. For example, she claimed that B.N.M.'s brother had suddenly been cured of his autism but then a minute later admitted that he is in speech and occupational therapy and attends a special school for autistic children. There were also departures from truth in Grandmother's assertions that she never missed or canceled any visits with B.N.M. when, in fact, as demonstrated clearly, she

had missed many. Her portrayal of the visits she did attend also varied greatly with the BCCYS testimony regarding supervisor reports of the character and quality of the interactions between herself, B.N.M. and E.M. Grandmother was evasive when initially asked about her missing a visit due to a hospitalization for anxiety, which Grandmother at first denied but then subsequently admitted. Finally, the Court had to take a ten minute recess when **Grandmother suddenly stopped answering questions from her own attorney, would not respond to queries of concern from this Court, and appeared to be unable to cope with the realization that truthful answers would be damaging to her case**.

The Court also found Grandmother's denials of involvement with the "Bring B. Home" Facebook page incredible, especially when she admitted that as the "page administrator" she was able to contact Facebook and have it removed. The disturbing page publication featured private photos of supervised visits and confidential medical information accessible only to Grandmother and the biological family and accused the Foster Parents of physically abusing B.N.M. and BCCYS of fabricating B.N.M.'s medical diagnoses. The page heightened the hostile environment surrounding the dependency proceedings at the time and [led] to credible safety threats against the Foster Family. This ultimately contributed to [the juvenile court] entering an order [suspending supervised visitation].

Trial Court, 4/15/16, at 16-17 (citation to record omitted) (emphasis added).

Thus, in addition to Grandmother's general lack of trustworthiness, the trial court made specific credibility determinations against Grandmother relating to the frequency of her attendance at supervised visitations, the quality of those visits, and her involvement with the incendiary Facebook community that aligned against BCCYS and Foster Parents during the dependency proceedings. The orphans' court also rejected Grandmother's

assertion that B.N.M. shared a close relationship with her older brother. The court found, "Despite Grandmother's insistence that B.N.M.'s relationship with her biological brother is paramount, Grandmother did not credibly establish that B.N.M. and her brother enjoy any bond whatsoever." *Id*. at 15.

Our review of the certified record supports the trial court's weight and credibility determinations. During the evidentiary hearing, Grandmother equivocated on several topics. She failed to adequately explain her decision to omit relevant information from BCCYS documentation regarding a PFA that Biological Father filed against Grandmother's live-in paramour, and while she asserted that the paramour did not drink alcohol, she was forced to concede that he had been arrested for public drunkenness. *Id*. at 51, 56. In addition, the record belied Grandmother's insistence that she did not tell BCCYS that caring for B.N.M.'s brother, E.M., was overwhelming in explaining to the agency why she was initially hesitant to be a placement resource. *Id*. at 35-36, 72.

Moreover, as the orphans' court noted, while Grandmother stressed that she missed few of the scheduled supervised visitations with her granddaughter, in actuality she missed at least four of the visitations that were scheduled between February and May 2014, and was up to one-half

hour late for other visitations that she did attend.[3] *Id*. at 36-37. Similarly, on one occasion Grandmother waited ten days before contacting the agency to reschedule a visitation that she canceled. *Id*. at 38.

Likewise, Grandmother's testimony regarding the nature of the supervised visitations conflicted with the contemporaneous notes maintained by the supervising caseworker. Specifically, Grandmother indicated that B.N.M. did not require a significant warm up period to "adjust and be comfortable" with her during the visitations, but the agency's notes belied that testimony and indicated that the child continued to be "standoffish" with Grandmother as late as August 2014. *Id*. at 40-41, 43.

As to E.M., the certified record does not reveal a close bond between him and B.N.M. Indeed, now five-year-old B.N.M. has not had contact with E.M. since before the supervised visitations were terminated during 2014. Additionally, the record belies Grandmother's characterization of the sibling relationship as wholly beneficial. While the two children posed for photographs during the supervised visits, which Grandmother introduced at trial, E.M. was regularly removed from the visitations due to his uncontrollable behaviors and the caseworkers' fear that he may strike his

---

[3] While Grandmother exercised monthly visitation during this period, she was also authorized to accompany E.M. to his hour-long supervised visitations with Mother and B.N.M. two times per month. The record does not delineate which type of visitation that Grandmother missed.

little sister. *Id*. at 39-40. The concern for the younger child's saftey was so palpable that the juvenile court eventually ordered Grandmother to have a second adult accompany her to supervised visitations so that someone could care for E.M. if he had to be removed from the visits for acting out. *Id*. at 39-40.

Finally, as it relates to the menacing Facebook page, Grandmother initially denied responsibility for the page or the threats or allegations contained therein. However, upon further questioning, she testified that she contacted Facebook to have the page removed. N.T., 1/27/16, at 23-24. She later conceded that only the page administrator was authorized to terminate the forum. *Id*. at 56, 69.

As the orphans' court findings are unassailable, we reject Grandmother's invitation to revisit those matters on appeal.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/19/2016