J-S66001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: B.N.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.M.M. | No. 336 MDA 2016 |

Appeal from the Decree January 29, 2016
In the Court of Common Pleas of Berks County
Orphans' Court at No(s): 83789

BEFORE: BOWES, PANELLA AND JENKINS, JJ.

MEMORANDUM BY BOWES, J.:            **FILED OCTOBER 19, 2016**

D.M.M. ("Great Aunt") appeals *pro se* from the January 29, 2016 order denying her petition to adopt her now-five-year-old niece, B.N.M.[1] We affirm.

B.N.M. was born during October 2011. She was premature and addicted to methadone as a consequence of her mother's drug use during pregnancy.[2] T.M. ("Mother") inaccurately identified her long-term paramour

---

[1] On the same date, the orphans' court entered a separate order denying a competing petition for B.N.M.'s adoption filed by the child's paternal grandmother. We address that appeal in a separate writing.

[2] B.N.M. suffers from Bell's palsy, exotropia, and delayed speech and motor development.

("Legal Father") as B.N.M.'s father on the child's birth certificate; however, subsequent DNA tests results confirmed that A.L. ("Father") was the birth father. Although the pair have never been in a committed relationship, Mother and Father have two children: B.N.M. and E.M., a now-seven-year-old boy born during May 2009. Father's mother ("Grandmother"), assumed custody of E.M. when the child was one year old.

Berks County Child and Youth Services ("BCCYS") became involved with the family during July 2013, in response to the drug use and homelessness of Mother and Legal Father. Mother and Legal Father consented to B.N.M.'s thirty-day placement with BCCYS and requested that the child be placed with Legal Father's acquaintances, C.M. and T.M. ("Foster Parents"), who are the adoptive parents.

On September 4, 2013, the juvenile court adjudicated B.N.M. dependent and continued placement with Foster Parents. While there is some dispute about Grandmother's initial commitment to care for B.N.M. when BCCYS first interceded, the record reveals that, when Grandmother presented as a kinship resource, Great Aunt supported her sister's claim. Great Aunt, an experienced foster parent who is affiliated with a support group that BCCYS considers adversarial, did not present herself as a kinship resource until after it became obvious that BCCYS had formed its preference that Foster Parents act as B.N.M.'s placement resource. Great Aunt is known to BCCYS and has a history of contentious litigation with the agency.

During the subsequent dependency proceedings, the juvenile court reaffirmed B.N.M.'s placement with Foster Parents "as she was thriving in that environment and Mother continued to move from rehab to jail to a psychiatric hospital." Trial Court Opinion, 4/15/15, at 4. Great Aunt accompanied Grandmother to some of the permanency hearings and attended at least one of the supervised visitations with B.N.M. in Grandmother's stead.

On December 7, 2013, Father relinquished his parental rights to B.N.M., and informed the court of his preference that Foster Parents adopt his daughter. On November 26, 2014, the orphans' court terminated the parental rights of Mother and Legal Father. Thereafter, Grandmother, Great Aunt, and Foster Parents filed competing petitions to adopt B.N.M. Following separate hearings on each of the petitions, during which BCCYS and the guardian *ad litem* tendered their respective preferences for Foster Parents, the orphans' court entered separate orders denying Grandmother's and Great Aunt's petitions. The orphans' court granted Foster Parents' petition and subsequently entered an adoption decree in their favor.

On February 24, 2016, Great Aunt filed a timely appeal from the order denying her adoption petition contemporaneously with a concise statement of errors complained of on appeal leveling six issues. On appeal, she pares those complaints down to the following three questions for our review:

A. Whether the [trial] court committed an abuse of discretion by denying [Great] [A]unt's petition to adopt [B.N.]M. where [she] is a licensed therapudic [sic] foster parent in the state of Pennsylvania, and all evidence the agency used against appellant was previously dismissed by the Commonwealth Court with prejudice.[3]

B. Whether the [trial] court improperly refused to consider the countless errors on the part of the agency where the agency had been cited for these errors by DHS and where these errors will have [lifelong] consequences for the minor child.

C. Whether the [trial] court placed undue weight upon the opinion of the guardian *ad litem* . . . without considering the long history of [her] errors and strong evidence of court-documented bias [that was] stipulated on the record . . . and where [the guardian *ad litem*] intentionally interfered with the relationship between the child's extended family and child.

Appellant's brief at 3.

Appellate review of an adoption decree is as follows:

When reviewing a decree entered by the Orphans' court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' court sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

_____

[3] Notwithstanding her reference to an unidentified Commonwealth Court case decision, Great Aunt does not discuss the case in the argument section of her brief corresponding to this issue. To the extent that Great Aunt intended to refer to our decision in ***In the Interest of D.P.***, 87 A.3d 876 (Pa.Super. 2013) (unpublished memorandum, filed October 4, 2013), Great Aunt's successful appeal from a pro-BCCYS order in an unrelated case, we discuss that case briefly in addressing her law-of-the-case argument in the third issue.

*In re E.M.I.*, 57 A.3d 1278, 1284 (Pa.Super. 2012) (citation omitted). Our scope of review of the order denying a petition for adoption is limited to the testimony and evidence adduced during the evidentiary hearings relating to the competing petitions for adoption. *In re Adoption of Farabelli*, 333 A.2d 846, 849 (Pa. 1975) ("scope of our review on this issue is limited to consideration of the testimony and the determination as to whether the Court's findings are supported by competent evidence").

The polestar of adoption proceedings is the best interest of the adoptee. Pursuant to 23 Pa.C.S. § 2902(a), the trial court must determine whether the proposed adoption would promote the child's needs and welfare. That *proviso* is as follows:

> If satisfied that the statements made in the petition are true, that the needs and welfare of the person proposed to be adopted will be promoted by the adoption and that all requirements of this part have been met, the court shall enter a decree so finding and directing that the person proposed to be adopted shall have all the rights of a child and heir of the adopting parent or parents and shall be subject to the duties of a child to him or them.

23 Pa.C.S. § 2902(a). Moreover, in § 2724, relating to testimony and investigations, the Adoption Act further highlights that the child's best interest is the only relevant factor in determining whether to grant or deny an adoption petition. Specifically, § 2724(b) provides in pertinent part, "In any case, the age, sex, health, social and economic status or racial, ethnic or religious background of the child or adopting parents shall not preclude an

adoption but the court shall decide its desirability on the basis of the physical, mental and emotional needs and welfare of the child.

Instantly, Great Aunt's first two claims assail BCCYS for what she characterizes as the "agency's neglect of clear and unambiguous laws" regarding the placement of dependent children. Appellant's brief at 12. She also paraphrases literature regarding the purported benefits gained from children knowing their biological family and interprets those articles as endorsing her generalized proposition that adopted children "fear rejection, have trouble making commitments, and avoid intimacy." *Id*. at 16. In sum, Great Aunt chastises BCCYS and the juvenile court for failing to prioritize her or Grandmother's placement applications during the dependency proceeding. She concludes, "ignoring all the literature . . . and . . . the law favoring keeping [children] with [their] family whenever possible, [BCCYS] placed [B.N.M.] with [strangers] . . . [a]nd then, spent the [next] year refusing to consider placement with relatives[.]" *Id*. at 19. For the reasons that follow, no relief is due.

Great Aunt's arguments regarding the agency's missteps during the dependency proceedings miss the mark. First, since our scope of review is limited to the testimony and evidence adduced during the adoption hearings, the agency's stewardship of the dependency action is not before us at this juncture. *See Farabelli*, *supra*. Accordingly, the assertions that do not implicate the orphans' court hearing or its determination whether the

proposed adoption would promote B.N.M.'s best interest fail as a matter of law.

Moreover, Great Aunt's position is premised upon the purported principle that she is entitled to adopt B.N.M. as a consequence of her status as a biological relative. A petitioner's genetic relationship with the child is a relevant consideration that the orphans' court must address in deciding to grant or deny a petition for adoption. **In re Adoption of D.M.H.**, 682 A.2d 315, 319 (Pa.Super. 1996) ("the trial court properly evaluated the familial relationship between grandmother and child by making the relationship a relevant, but not a controlling, consideration."). Notwithstanding the respect that the orphans' courts must have for the biological relationship, the best interest of the child remains the guiding principle of adoption proceedings. This reality severely undercuts Great Aunt's premise that, as a genetic relation to B.N.M., her adoption petition was ideal, or at least superior to Foster Parents' petition.

In rejecting Great Aunt's petition, the trial court considered the degree of consanguinity between Great Aunt and B.N.M. and determined that the evidence adduced during the hearing demonstrated that the proposed adoption was not in the child's best interest. The court explained,

> Although Great Aunt may have been willing and ready to adopt B.N.M. there was little credible evidence and testimony presented to allow this [c]ourt to determine that Great Aunt is capable of caring for B.N.M., nor that it is in the best interest of B.N.M. to be adopted by her. The fact that Great Aunt is or is not

- 7 -

a licensed therapeutic foster parent is but one piece of evidence in the overall determination as to B.N.M.'s best interest. In this case, the [c]ourt found substantial and compelling reasons to grant the petition of the Foster Parents for adoption over Great Aunt's petition. Great Aunt's blood relationship to B.N.M. while relevant, was not enough to overcome major concerns over her suitability to raise B.N.M. in her home.

Trial Court Opinion, 4/15/16, at 26.

The certified record sustains the orphans' court's determination that Great Aunt's evidence was lacking. During the adoption hearing, Great Aunt neglected to proffer evidence to demonstrate that the proposed adoption would promote B.N.M.'s physical, mental, and emotional needs and welfare. The certified record reveals that Great Aunt dedicated her case-in-chief to degrading BCCYS, the guardian *ad litem*, and the juvenile court for their respective shortcomings. She failed to present any evidence regarding her relationship with B.N.M. or provide a plan to assimilate the young child into a family that, if she ever knew, she had not seen in more than one year. Likewise, Great Aunt did not discuss the conditions of her home, inform the orphans' court about prior allegations of abuse leveled against her husband,[4]

_____

[4] BCCYS introduced evidence during the adoption hearing that Great Aunt's daughter and two of Great Aunt's former stepchildren previously claimed to be victims of abuse. N.T., 4/15/16, at 44; CYS Exhibit 3 at 3, 12-21. Great Aunt vehemently denied the veracity of those allegations and noted that this Court subsequently vacated the juvenile court order granting BCCYS's request for an offender evaluation in an unrelated case that implicated those allegations. Great Aunt also disputed the authenticity of a police report that BCCYS introduced to establish that she filed a petition for protection from
*(Footnote Continued Next Page)*

or explain how she intended to satisfy B.N.M.'s special needs. At most, Aunt referenced her license for therapeutic foster care and noted that she possessed a home study that was completed in conjunction with the 2014 adoption of her son. Significantly, however, that home study, which was not performed by BCCYS, indicated that Great Aunt's home was an appropriate placement resource for a non-special-needs boy under five years old. In contrast, B.N.M. is a girl with special needs insofar as she suffers from Bell's Palsy and delayed speech and motor development. Thus, the home study that Great Aunt relied upon was not only stale, but also of questionable value in relation to her proposed adoption of B.N.M. For all of these reasons, Great Aunt's first two arguments are unpersuasive.

The crux of Great Aunt's final argument is unclear. Her statement of questions presented declares that the trial court improperly deferred its judicial decision-making authority to the guardian *ad litem*; however, her argument is replete with partial references to citations that the Department of Human Services purportedly issued against BCCYS, the orphans' court's credibility determinations, and the juvenile court's supposed dismissal of allegations relating to an emergency PFA order that she filed against her husband during 2002. Great Aunt does not fashion these jumbled assertions

*(Footnote Continued)* _____

abuse against her husband during 2002. N.T., 4/15/16, at 46-47; CYS Exhibit 3 at 2.

into a cogent argument. Instead, she invokes principles of *stare decisis* and baldly asserts, "The very courts that spent extensive time examining all of the same allegations and same evidence against [her] determined [that] there was no merit to the allegations." Appellant's brief at 20.

To the extent that Great Aunt continues to maintain that the orphans' court was too deferential toward the guardian *ad litem*, we observe that the court explained that it considered the guardian *ad litem* credible and "[a]ny bias perceived by Great Aunt appears to the [c]ourt to be due to the fact that the Guardian's Report . . . did not recommend that Great Aunt's [p]etition for [a]doption be granted. The Great Aunt, herself, has an obvious bias against BCCYS." **See** Trial Court Opinion, 4/15/16 at 25. In sum, the orphans' court concluded, "[w]hile . . . [it] . . . incorporated the Guardian's opinions and reports into its decision, the [c]ourt was not unduly influenced by the Guardian and did not blindly follow her recommendation. The [c]ourt granted Foster Parents' petition after much careful consideration and weighing of all the relevant evidence." **Id**. As our review of the certified record supports the orphans' court's characterization of its deliberations, we reject Great Aunt's claim that it delegated its judicial authority.

Furthermore, as to the merits of the orphans' court's decision-making, we note that, to the extent that Great Aunt's unexplained references to *res judicata*, collateral estoppel, and *stare decisis* invoke this Court's 2013 memorandum opinion discussing the prior abuse allegations raised against

her husband, she misstates our holding in that case. ***In the Interest of D.P.***, 87 A.3d 876 (Pa.Super. 2013) (unpublished memorandum), involved Great Aunt's appeal from a juvenile court order that directed her husband to undergo a sexual offender evaluation based upon a July 2012 report that alleged he committed inappropriate physical discipline and sexual conduct against the family's children ten to twenty years earlier. While Great Aunt proclaims that this Court determined that the underlying allegations of abuse were unfounded, in reality, we held that the juvenile court order was **legally** unsupportable. Specifically, we determined that, in light of the applicable statutory framework, the allegations of physical abuse were stale and the juvenile court neglected to specifically identify the alleged sex abuse in the order directing the evaluations. We stated, "in light of the [fact that the] trial court's finding of probable cause [refers] only [to] inappropriate physical discipline . . . [,] there is no basis for the trial court to order a sexual offender evaluation. . . . A sexual offender evaluation certainly would not reveal any information about whether inappropriate physical discipline did in fact occur." ***In the Interest of D.P.***, ***supra***, (unpublished memorandum at 11-12) (footnote omitted). As this Court vacated the juvenile court order for reasons unrelated to the veracity of the underlying allegations of physical and sexual abuse, we did not make a merits determination regarding the factual accuracy of those assertions. Thus, we reject Great Aunt's claim that our holding in ***In the Interest of D.P.***, is the

law of the case regarding whether the allegations of abuse were unfounded.

No relief is due.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/2016